DOUGLAS H. WIGDOR (NY SBN 2609469)
JEANNE M. CHRISTENSEN (NY SBN 2622124)
TANVIR H. RAHMAN (NY SBN 4921235)
ELIZABETH J. CHEN (NY SBN 5126214)
(To be admitted *pro hac vice*)
**WIGDOR LLP**
85 Fifth Avenue, Fifth Floor
New York, NY 10003
Tel.: (212) 257-6800
Fax: (212) 257-6845

JAMIE C. COUCHE (SBN 252001)
**ANDERSON & POOLE, P.C.**
601 California Street, Suite 1300
San Francisco, CA 94108
Tel.: (415) 956-6413
Fax: (415) 956-6416

Attorneys for Plaintiffs,
**JANE DOE 1 and JANE DOE 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, | Case No.: |
| Plaintiffs, | **JURY TRIAL DEMAND** |
| vs. | **COMPLAINT** |
| UBER TECHNOLOGIES, INC., | |
| Defendant. | |

Plaintiffs Jane Doe 1 and Jane Doe 2 by and through undersigned counsel Wigdor LLP and Anderson & Poole, P.C. as and for their Complaint against Defendant Uber Technologies, Inc. ("Uber," the "Company" or "Defendant"), hereby allege as follows:

## PRELIMINARY STATEMENT

1.      Uber is an incredibly popular and rapidly expanding transportation company whose smartphone app ("App") allows people to order and pay for taxi rides through their phones.  Uber has been valued as being worth in the tens of billions of dollars.  Sadly, Uber has proven time and time again that it is willing to sacrifice the safety and well-being of its customers – particularly its female customers – for the sake of padding its corporate bottom-line.

2.      Uber markets itself extensively as the best option for a safe ride home after a night of drinking.  Indeed, the Company commissioned a report with Mothers Against Drunk Driving ("MADD") where it declared: "When empowered with more transportation options like Uber, **people are making better choices that save lives.**" (emphasis added).

3.      The Company further claimed that "Uber and MADD are working toward a world **where a safe ride is always within reach and where drunk-driving is a thing of the past**." (emphasis added).

4.      The marketing campaign has expanded to include discounts for Uber users to purchase the "Breathometer," a smartphone breathalyzer, and the companies have partnered to provide rewards in exchange for continued use.

5.      Uber even gives out swag at concerts with taglines such as "**Drink Up & Uber On**."

6.      But what Uber does not share with riders is that making the choice to hail a ride after drinking also puts them in peril from the Uber drivers themselves.  By marketing heavily toward young women who have been drinking while claiming that rider safety is its #1 priority, Uber is instead putting these women at risk.

*Complaint for Damages*                                   *Doe 1, et al. v. Uber Technologies, Inc.*

7.      Uber's claims of rider safety have proven to be false and hollow.  Investigations into its safety measures reveal that Uber routinely fails to adequately screen its employees and regularly hires drivers with known criminal histories, at the expense of its customers who are placed squarely in danger.  Further, Uber openly admits that it fails to exercise any supervision over drivers while they are working.

8.      Through its relentless marketing efforts, Uber has urged the public to defy common sense and undermine every parent's edict – "don't get in a car with a stranger." Unfortunately, despite its self-proclaimed "commitment to safety," opening the Uber App and setting the pick-up location has proven to be the modern day equivalent of electronic hitchhiking. Buyer beware – we all know how those horror movies end.

9.      Since forming in 2010, Uber's corporate policy of "profits over safety" has quickly emerged as the operating model for its successful aggressive global expansion.

10.      Unfortunately, the model of "profits over safety" is also responsible for the tragedies at the center of this litigation.

11.      Plaintiff Jane Doe 1 is a female Uber rider that the Company failed to protect. Jane Doe 1 was sexually assaulted in Boston, Massachusetts on February 7, 2015 by an Uber driver named Abderrahim Dakiri ("Dakiri").  The Uber App was used to arrange a ride to take Jane Doe 1 and several friends home.  After dropping off her friends, Dakiri took Jane Doe 1 on an off-route detour to her destination, during which he took the opportunity to sexually assault her.

12.      Plaintiff Jane Doe 2 is a female Uber rider that the Company failed to protect. Jane Doe 2 was sexually assaulted in Charleston, South Carolina on August 9, 2015 by an Uber

*Complaint for Damages*                                                          *Doe 1, et al. v. Uber Technologies, Inc.*

driver named Patrick J. Aiello ("Aiello").  The Uber App was used by one of Ms. Doe 2's male friends to arrange a ride to pick the group up and take them to a bar.  After dropping off her friend, Aiello, under the guise of driving Ms. Doe 2 home, instead took her on an off-route detour, during which he took the opportunity to viciously rape her.

13.     As detailed herein, Uber's negligence, fraud, misleading statements and other unlawful actions caused Plaintiffs' sexual assaults, which humiliated, degraded, violated and robbed Plaintiffs of their dignity.  The attacks on Plaintiffs have caused them to suffer both physical and psychological harm from which they may never fully recover.[1]

14.     Through the imposition of a court-ordered injunction mandating certain immediate safety measures, this lawsuit seeks to slam the brakes on Uber's reckless expansion at the unfortunate expense of basic customer safety.

## JURISDICTION AND VENUE

15.     The jurisdiction of this action arises under diversity of citizenship, which is codified pursuant to 28 U.S.C. § 1332, given that Ms. Doe 1 is a citizen of Connecticut whose assault took place in Massachusetts, Ms. Doe 2 is a citizen of Florida whose assault took place in South Carolina, Defendant is a citizen of California, and this action involves an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

---

[1]     *See* Rebecca M. Loya, *Rape as an Economic Crime: The Impact of Sexual Violence on Survivors' Employment and Economic Well-Being*, J. INTERPERSONAL VIOLENCE (Nov. 6, 2014). According to studies, sexual assault and the related trauma response can disrupt survivors' employment in several ways, including time off, diminished performance, job loss, and inability to work.  These outcomes can have long term impacts on the financial well-being of survivors, limiting long-term economic stability.  *Id.*

*Complaint for Damages*                                                                 *Doe 1, et al. v. Uber Technologies, Inc.*

16. The Court has personal jurisdiction over Defendant because it is headquartered in San Francisco, California and it conducts business in California.

17. Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant is headquartered in this District and because Defendant conducts business in this District.

## PARTIES

18. Jane Doe 1 is an adult woman who is a citizen of Connecticut and presently resides in Boston, Massachusetts.

19. Jane Doe 2 is an adult woman who is a citizen of Florida, and who resided in Charleston, South Carolina on August 9, 2015.

20. Defendant Uber Technologies, Inc. is a Delaware Corporation with its principal place of business at 1455 Market Street, San Francisco, California 94105.

21. Defendant Uber Technologies, Inc. operates throughout the United States, including in Boston, Massachusetts, maintaining an office at 239 Causeway Street, 1st Floor, Boston, MA 02114.

22. Defendant Uber Technologies, Inc. operates throughout the United States, including in Charleston, South Carolina.

## BACKGROUND AND FACTUAL ALLEGATIONS

### I.  Uber Technologies, Inc.

23. Launched in San Francisco in June 2010, Uber operates as a "transportation network company" throughout the world.  In a relatively new industry called "ridesharing," Uber connects drivers and riders through a downloadable smartphone application called "Uber."

Page **5** of **52**

*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

Individuals who have downloaded the App use it to make a transportation request.  They are then matched with an Uber driver who picks them up and drives them to a destination.  App users must pay for the ride through the App with a credit card.  Uber pays the driver a share of the fare collected, and retains the remainder.

24.     As detailed *infra*, Uber's business model requires an enormous pool of drivers in order to provide rides to customers quickly and efficiently.  To accomplish this, Uber solicits and retains thousands of non-professional drivers.  Uber markets to potential drivers on its website, where it states: "Uber needs partners like you.  Drive with Uber and earn great money. . .  Get paid weekly just for helping your community of riders get rides around town."  After these drivers are hired by Uber, Uber makes the drivers available to the public to provide transportation services through its App.

25.     As of June 1, 2015, Uber employed over 1 million drivers and claims to be adding hundreds of thousands of drivers to its payroll every month.

26.     By 2015, Uber had raised $2.8 billion in total funding, and it is projected that the Company will generate $10 billion in revenue by the end of 2015.

27.     In its most mature market, San Francisco, Uber's revenues are more than three times the size of the local taxi market, with revenues running at $500 million a year in that city alone.

28.     Neither drivers nor customers are charged fees to download the Uber App.  Uber's sole source of revenue is from charges to riders for trips taken.

29.     Uber's reckless expansion is the precise factor that has led to such staggering profits in such a short amount of time.

*Complaint for Damages*                                        *Doe 1, et al. v. Uber Technologies, Inc.*

30.     Uber's goal of dominating and controlling the emerging rideshare market at the expense of customer safety is a calculated decision made by senior executives that continues through the present.

31.     Uber accomplished its aggressive national expansion by entering cities throughout the U.S. and ignoring long-standing legal and regulatory authority for taxi and limousine services in nearly every city in which it operates.  Existing taxi and limousine companies are forced to comply with licensing laws, and vehicle safety and consumer protections that Uber flouts and intentionally disregards.

32.     Without the costly strictures of regulated taxi companies, Uber became competitive and then dominant in the vehicle-for-hire market in a fraction of the time it would have taken had it entered the transportation market through traditional methods.

33.     The emerging policy of "profits over safety" quickly became the operating model for Uber's expansion.

34.     Unfortunately, this model also became responsible for the tragedies at the center of this action.

## II.     Uber Employs Thousands of Drivers

35.     Uber employs its drivers throughout the U.S. (including Dakiri and Aiello) in traditional at-will relationships, in which the Company has the discretion to fire its drivers for any reason and at any time.

36.     In order to become a driver for Uber, individuals apply through Uber's website. The application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance.

*Complaint for Damages*                                          *Doe 1, et al. v. Uber Technologies, Inc.*

37.     Uber does not verify vehicle ownership.  Rather, it only requires that the vehicle is registered and is not more than ten years old.

38.     At no point does any Uber employee verify that the person applying to be the driver is uploading his or her own personal documents.

39.     Uber then sends driver application information to Hirease, LLC ("Hirease"), a private background check company.

40.     Hirease does not perform stringent background checks. Drivers are not required to submit fingerprints for comparison against Department of Justice and Federal Bureau of Investigation databases.  Rather, Hirease simply runs potential drivers' social security numbers through records databases similar to those held by credit agencies, which only go back for a period of seven years.

41.     Remarkably, Uber fails to implement stricter background checks for its driver applicants to whom Uber App users will later entrust their lives and well-being (as well as the lives and well-being of others that may ride with them when they use the App to order a ride, or others on whose behalves rides are ordered), despite knowing the reality that job applicants frequently submit false information to their employers.  In fact, on its own website, Hirease acknowledges that many job applicants lie about information they submit to an employer, and that "40% of resumes contain material lies or omissions about education, past employment or qualifications."

42.     Hirease also recognizes the importance of background checks to weed out applicants with criminal backgrounds.  As Hirease states, "10% of job applicants have a criminal

record." Nonetheless, Uber does not require fingerprint background checks of its applicants, which would turn up a person's criminal history.

43.     Moreover, if a driver commits a crime after Hirease runs its initial background check, Uber will not be notified.

44.     Drivers are not charged a fee by Uber to apply to become employees.

45.     Drivers are not charged a fee to download the App to receive notifications of rides mediated by Uber.

46.     Furthermore, fare prices for rides are set exclusively by Company executives. Drivers have no input on fares charged to customers. Drivers are not permitted to negotiate with customers on fares charged.

47.     However, Uber can and does directly modify charges to customers if the Company determines that a driver has taken a circuitous route to a destination.

48.     Uber takes a fee ranging between twenty percent (20%) and thirty percent (30%) of every ride charged to a customer.

49.     Uber controls its drivers' contacts with its customer base, and considers its customer list to be proprietary information. To that end, drivers are not permitted to answer rider inquiries about booking future rides outside of the Uber App.

50.     Uber retains the right to terminate drivers, with or without cause.

51.     Uber requires its drivers to accept all ride requests when the drivers are logged into the App. Drivers who reject too many ride requests risk facing discipline, including suspension or termination.

*Complaint for Damages*                              *Doe 1, et al. v. Uber Technologies, Inc.*

52.     Uber attempts to impose some level of uniformity in connection with the conduct of its drivers while they are transporting riders.  Uber mandates that its drivers, *inter alia*: dress professionally; send the customer who has ordered a ride a text message when the driver is 1-2 minutes away from the pickup location; keep their radios either off or on "soft jazz or NPR;" open the door for the customer; and pick up the customer on the correct side of the street where the customer is standing.

53.     Customers give feedback on rides they have taken, and rate drivers on a scale from 1-5 stars.  These ratings are used by Uber to discipline and terminate drivers.

54.     In some cities, Uber incentivizes its drivers to remain its employees and not join any rival taxi transportation companies by paying drivers a minimum of $10-$26 merely to log into the Uber App, accept 90% of ride requests, do one trip per hour, and be online 50 out of 60 minutes.  As a result, they will be paid the guaranteed minimum rate regardless of the number of rides they actually give, tantamount to a salary.

55.     Despite the above facts, as a matter of policy, Uber claims that drivers are not at-will employees, but rather independent contractors.  The value of classifying workers as independent contractors is an integral part of the ride-sharing company's business model, and has saved Uber millions of dollars.

56.     The consequence to passengers is significant, most notably for the fact that Uber refuses to commercially insure drivers, resulting in a substantial deficit of appropriate coverage. In contrast, regulated taxi and limousine companies are forced to comply with commercial insurance minimums imposed by local and state legislation that exists to protect individual consumers.

*Complaint for Damages*                                   *Doe 1, et al. v. Uber Technologies, Inc.*

57.     Uber's refusal to insure drivers is a cost-saving measure, but it is also a reflection of the Company's intentional decision to distance itself from potential liability, given its intimate knowledge of the risks and potential dangers associated with allowing non-professional drivers access to transport individual consumers without any oversight.

**III.     Material Misrepresentations to Riders that Uber Provides the "Safest Rides on the Road"**

58.     The application process to become an Uber driver is simple, fast and designed to allow the Company to hire as many drivers as possible while incurring minimal associated costs. Such cost saving, however, is at the expense of riders, especially female riders.   Specifically, at no time during the application process does Uber or Hirease, acting on Uber's behalf, do the following:

- conduct Live Scan biometric fingerprint background checks of applicants;

- conduct in-person interviews of applicants;

- verify vehicle ownership;

- conduct physical vehicle inspections;

- verify that social security numbers and other personal identification numbers submitted in the application process in fact belong to the applicants;

- require applicants to attend training classes on driving skills;

- require applicants to attend training classes to prevent harassment, including sexual harassment;

- require applicants to attend training classes to hone skills needed for safely using mobile Apps while driving;

- require applicants to pass written examinations beyond basic "city knowledge" tests;

*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

- require applicants to pass road vehicle tests; and

- require applicants to pass vision and hearing exams.

59.     Indeed, as recently alleged in a complaint filed by the District Attorney of San Francisco and the District Attorney of Los Angeles, *The People of the State of California v. Uber Technologies, Inc.*, Case No. 14-cv-543120-CGC  (Superior Court of the State of California filed August 18, 2015), Uber's security screening is so deficient that, upon information and belief, individuals *passed* Uber's screening process and were found driving for Uber with the following felony convictions: (1) second degree murder, (2) lewd and lascivious acts against a child under the age of 14, (3) sexual exploitation of children, (4) kidnapping for ransom with a firearm, (5) assault with a firearm, (6) grand theft, (7) robbery, (8) identity theft, (9) burglary, and (10) taking a vehicle without consent.  In addition, a number of Uber drivers, upon information and belief, have previously been convicted of driving under the influence and driving with a suspended license and yet still passed Uber's purportedly strict background checks.

60.     Rather than notify riders of these failures, Uber fills its website with pictures of smiling young women entering and exiting vehicles, who are meant to appear "safe."



*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18



19
20
21
22
23
24
25
26
27
28



*Complaint for Damages*                              *Doe 1, et al. v. Uber Technologies, Inc.*





61. In fact, Uber misrepresents to customers, on a global scale, on its website, the following:

> **Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road.** That means setting the strictest safety standards possible, and then working hard to improve them every day. The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – **what we are doing in the US is an example of our standards around the world**.

(emphasis added).

*Complaint for Damages*                    *Doe 1, et al. v. Uber Technologies, Inc.*

62.     Clearly, safety policies emanating from San Francisco dictate the safety protocols for Uber locations throughout the country.

63.     In fact, until as recently as October 2014, Uber represented that "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards.  This includes a three step criminal background screening for the U.S. – with county, federal and multi-state checks that go back as far as the law allows – and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

64.     Although Uber attempts to distance itself from situations in which it would potentially incur liability, a customer would need to sift through pages of text and click through multiple links in order to even find the following section in which Uber unbelievably tries to disclaim responsibility for negligent and harmful conduct by its own drivers:

> THE QUALITY OF THE TRANSPORTATION SERVICES SCHEDULED THROUGH THE USE OF THE SERVICE OR APPLICATION IS ENTIRELY THE RESPONSIBILITY OF THE THIRD PARTY PROVIDER WHO ULTIMATELY PROVIDES SUCH TRANSPORTATION SERVICES TO YOU. YOU UNDERSTAND, THEREFORE, THAT BY USING THE APPLICATION AND THE SERVICE, **YOU MAY BE EXPOSED TO TRANSPORTATION THAT IS POTENTIALLY DANGEROUS, OFFENSIVE, HARMFUL TO MINORS, UNSAFE OR OTHERWISE OBJECTIONABLE**, AND THAT YOU USE THE APPLICATION AND THE SERVICE AT YOUR OWN RISK.

(emphasis added).

65.     Sadly, Plaintiffs were victims of "unsafe," "dangerous" and "offensive" conduct by Uber drivers.

*Complaint for Damages*                              *Doe 1, et al. v. Uber Technologies, Inc.*

## IV.    UBER TARGETS INTOXICATED FEMALE RIDERS

66.    Uber's advertising campaigns further make the assertion that it provides the best option for a safe ride home after a night of drinking.  Indeed, the Company commissioned a report with MADD where it declared: "When empowered with more transportation options like Uber, **people are making better choices that save lives**" (emphasis added).

67.    The Company further claimed that "Uber and MADD are working toward a world where a safe ride is always within reach and where drunk-driving is a thing of the past."

68.    The report and others have been widely publicized by Uber and its press team, correlating the existence of Uber drivers and vehicles in a city with diminished drunk driving rates.

69.    Uber's marketing campaign has expanded to include discounts for Uber users to purchase the "Breathometer," a smartphone breathalyzer, and the companies have partnered to provide rewards in exchange for continued use.

70.    But what Uber has not shared with riders is that making the choice to hail a ride after drinking also puts those same riders in peril from the Uber drivers themselves.  By marketing heavily toward young women who have been drinking while claiming that rider safety is its #1 priority, Uber is instead putting these women at risk.

71.    Although Uber advertises that it is committed to providing customers with the "safest ride on the road," the reality is that at the hands of an Uber driver, Plaintiffs were subjected to traumatic and harrowing sexual violence that no person should be forced to endure.

## V.    Jane Doe 1

72.    Jane Doe 1 resides in Boston, Massachusetts.

*Complaint for Damages*                                        *Doe 1, et al. v. Uber Technologies, Inc.*

73.     On February 7, 2015, Ms. Doe 1 and three of her female friends went out to dinner and then to a party.

74.     Early in the morning on February 8, 2015, at approximately 2:30 a.m., one of Jane Doe 1's friends used Ms. Doe 1's Uber App to order a car.

75.     Jane Doe 1 and her friends received confirmation texts from the driver, Dakiri, that he was on his way.

76.     The three friends resided at the same location and Dakiri dropped them off first. Thereafter, Ms. Doe 1 gave Dakiri the address of her destination, which should have taken approximately ten minutes to drive to from their first stop.

77.     Ms. Doe 1 was in the front passenger seat and Dakiri began making conversation with her.

78.     However, shortly after initiating small talk, Dakiri began to sexually assault Ms. Doe 1.

79.     Dakiri, who is approximately 38 years of age, 6'3" and more than 200 pounds, was physically intimidating and dominant over Ms. Doe 1, who weighs less than 100 pounds and was 20 years of age.

80.     First, when the vehicle was stopped at a red light, Dakiri began groping Ms. Doe 1 in the crotch, upper thigh and top of her pants.  Ms. Doe 1 was shocked and terrified.

81.     At the following red light, Dakiri told her that he "really liked her" and forcibly kissed Ms. Doe 1, including on her cheek and neck.  Ms. Doe 1's attempts to push him off and yell "no" were to no avail.

82.     This unfortunate scenario repeated each opportunity Dakiri had during the drive.

*Complaint for Damages*                                          *Doe 1, et al. v. Uber Technologies, Inc.*

83.     Although frightened and scared, Ms. Doe 1 realized at some point that Dakiri had not taken a direct route to her destination and instead, he had driven her more than 15 minutes off route in order to increase his opportunity to sexually assault her.

84.     Although it was past 2:30 a.m., Ms. Doe 1 attempted to text several friends to tell them that her Uber driver was trying to kiss and "rape" her, and asking them to "call for help."

85.     Ms. Doe 1 was afraid to jump out of the vehicle in an unknown area of the city at 2:30 a.m., and continued to attempt to reach friends via text message.

86.     Before anyone responded, Dakiri turned into a street that was near the street Ms. Doe 1 had asked him to drive her to.  Dakiri pulled over to a remote area and parked the car.

87.     Extremely frightened, Ms. Doe tried to flee but her door was locked.  The next thing she knew, Dakiri's huge body was on top of hers, trying to kiss her and continuing to grope her.  Petrified, Ms. Doe 1 was unable to push him off.  She was subjected to his sexual assault until she manipulated the door lock, flung open the door, ran out of the car and continued running until she arrived at her friend's house.

88.     The door to her friend's house was locked and while she was trying to call, a young woman walked by and saw Ms. Doe 1 crying and in distress.

89.     Ms. Doe 1 told her that Dakiri had sexually assaulted her and the two women proceeded to a nearby apartment and called 911.

90.     Following Dakiri's arrest, Ms. Doe 1 learned that Dakiri had resided in the United States for less than three years.

91.     Subsequently, acknowledging that Dakiri had in fact driven Ms. Doe 1 off route and twice as far as necessary, Uber refunded Ms. Doe 1's charge of $27 for the ride.

**A.**   **Uber's Intentional Lack of Compliance with the City of Boston's Safety Regulations**

92.     In 2011, Uber inserted itself, without incurring the expense, time and effort to comply with regulations, into the city of Boston, where all other vehicles for hire must comply with the existing safety regulations in order to operate.

93.     Uber's unregulated and unlicensed vehicles operate throughout Boston, at the expense of the licensed taxis, because the Company has intentionally decided to operate unlawfully, in defiance of decades of regulations and legal authority.

94.     For the purpose of ensuring the safety and protection of its residents, the city of Boston has strict regulations governing the taxi industry.  Licensed taxi companies cannot operate without complete compliance with these regulations, which costs companies time and money. *See* City of Boston Code 16-15.05: Vehicle for Hire Ordinance, Taxi Rules (regulating vehicle inspections and setting standards for the age, condition, equipment, lack of damage and cleanliness of vehicles).

95.     In addition to the many safety regulations specific to the vehicles, the regulations are designed to protect Boston citizens from potentially dangerous taxi drivers by requiring drivers to meet 17 criteria before they can even apply to operate a taxi.  Applicants must:

- be twenty-one (21) years of age or older;

- pass a standard examination demonstrating the ability to speak, read, write and understand the English Language;

- participate in Hackney Carriage testing and training as determined by the Inspector of Carriages;

- have an original Birth Certificate, Alien Card, Asylum Document, US Passport or Naturalization Papers;

*Complaint for Damages*                                                     *Doe 1, et al. v. Uber Technologies, Inc.*

- not have a Hackney Carriage Driver's License that is revoked or suspended in any jurisdiction;

- have a valid Massachusetts Driver's License;

- have had a Driver's license in the United States for at least two (2) years;

- not have been adjudged a Habitual Traffic Offender, as defined by Massachusetts General Law Chapter 90 section 22F, or the equivalent in any jurisdiction, within the past five (5) years;

- not have any outstanding or unresolved driving infractions which could result in the applicants Driver's license being suspended or revoked in any jurisdiction;

- not have had his or her Driver's License suspended for five (5) or more Surchargeable Incidents, as defined by Chapter 211 of the Code of Massachusetts Regulations section 134, or the equivalent in any jurisdiction, within the past five (5) years;

- not have more than four violations of the Traffic Laws and/or At-Fault Accidents as defined by Chapter 211 of the Code of Massachusetts Regulations section 134 or an equivalent department in the last three (3) years (violations and accidents occurring on the same date will count as only one) in any jurisdiction;

- not have any Operating Under the Influence of drugs or alcohol convictions or dispositions under Massachusetts General Law Chapter 90 section 24D within the past five (5) years or the equivalent in any jurisdiction;

- not have any felony convictions within the last five (5) years in any jurisdiction;

- not have any drug convictions in the last five (5) years in any jurisdiction;

- not have any dispositions for a criminal offense, in any jurisdiction, that would result in the denial of a license, including admissions to sufficient facts or continues of an offense without resolution, unless the circumstances of such incident are reviewed by the Inspector of Carriages as to the specific facts and circumstances and the applicant is thus approved by the Inspector of Carriages;

- not be required to register as a sex offender in any jurisdiction; and

- not have any outstanding or unresolved criminal court cases in any jurisdiction which could result in the license being denied if the Applicant was convicted of the alleged offense.

96.     In contrast to the Boston regulations, as described *supra*, Uber "selects" its drivers by failing to even require an in-person interview with applicants.

97.     The Boston regulations are requirements that individuals must meet before they can even be eligible to apply.  Following an application, individuals must undergo training, pass examinations and personally appear for an interview, among other requirements.

98.     In sum, Uber's claim that its standards are "often more rigorous than what is required to be a taxi driver" is false.

99.     To date, there is proposed regulatory legislation pending in Boston, but Uber remains free from true regulatory oversight in the city.

**VI.     Jane Doe 2**

100.     Jane Doe 2 is a citizen of Florida, who has attended school for over a year in Charleston, South Carolina.

101.     On August 9, 2015, Ms. Doe 2 used her Uber App to order a car, which she took to meet a male friend at the Bay Street Biergarten, located at 549 East Bay Street, Charleston, South Carolina 29403.

102.     When Ms. Doe 2 arrived, her friend was at the Bay Street Biergarten with two additional men, whom Ms. Doe 2 also knew.  Several hours later, the four friends went back to one of their apartments, which is located in Charleston.

103.     At the apartment, one of the men used his Uber App to order the group an Uber car for a 5:00 p.m. pick-up.

104.     Aiello arrived to pick up the group in a minivan with an Uber sticker in the lower right corner of the windshield.

*Complaint for Damages*                                        *Doe 1, et al. v. Uber Technologies, Inc.*

105.     Upon information and belief, Aiello does not have a South Carolina driver's license.

106.     Upon information and belief, Aiello is not a registered owner of the vehicle used to pick up the group.

107.     Aiello drove them to The Windjammer, a bar located at 1008 Ocean Blvd., Isle of Palms, South Carolina 29451.  Ms. Doe 2 sat in the front seat, while the three men sat in the back.  Ms. Doe 2 did not speak with Aiello during the ride.

108.     Aiello, at all times during the 30-35 minute ride, used his phone for navigation to the Windjammer.

109.     When they arrived at The Windjammer, the four friends noticed Aiello also enter the bar, which the three men remarked to one another as "weird."

110.     Ms. Doe 2 and her friends remained at the bar for nearly five hours.

111.     At some point during the night, the group again noticed Aiello in the bar.  This time, he was sitting at the bar, but they did not interact with him.

112.     Near the end of the evening, two members of their group left the bar first, leaving Ms. Doe 2 and one male friend at the Windjammer for approximately another hour before they too decided to leave.

113.     Ms. Doe 2 and her friend were driven back to her friend's apartment by Aiello.

114.     During the ride back, Ms. Doe 2 and her friend sat in the middle row of the minivan.  At some point during the ride, Ms. Doe 2 mentioned that she could not find her phone and wanted to look for it at her friend's apartment when they got there.

115.    Ms. Doe 2 intended to collect her phone from her friend's apartment and walk the two blocks home to her apartment.

116.    When they arrived at the apartment, Ms. Doe 2 went into the apartment and looked for her phone for about 5-10 minutes, and after not finding it, left for her own apartment.

117.    When Ms. Doe 2 went outside, Aiello said he would drive her home.

118.    After getting into the vehicle and still believing that Aiello was acting in his capacity as an Uber driver, Ms. Doe 2 gave Aiello her home address while she began looking in her purse again to see if her phone was there.

119.    Soon thereafter, she looked up and realized Aiello had driven her in the wrong direction.

120.    Ms. Doe 2 informed Aiello they were going in the wrong direction, to which he asked, "**How are you going to pay me?**"

121.    Aiello told Ms. Doe 2 that she owed him a blow job.  Ms. Doe 2 continued to frantically search through her purse, stating "Where's my phone?  I can't find my phone."

122.    Aiello responded that he had Ms. Doe 2's phone but was not going to give it back to her.

123.    Ms. Doe 2 began to panic and repeatedly tried to open the car door and jump out of the vehicle, but Aiello had locked the doors.

124.    At this point, Aiello had driven Ms. Doe 2 into a dark, remote parking lot off a highway area.

125.    Aiello forced his face onto Ms. Doe 2's, trying to "kiss" her, and then proceeded to viciously rape her and threaten her with harm multiple times.

*Complaint for Damages*                                      *Doe 1, et al. v. Uber Technologies, Inc.*

126.    After the attack ended, Ms. Doe 2 was able to get onto the highway, crossed to the median, and then started running alongside the highway away from the parking lot.

127.    As Ms. Doe 2 was waving her arms into the highway for help, a passing vehicle hit Ms. Doe 2's arm, stopped, called 911, and waited with Ms. Doe 2 for the police, who took her to the hospital.

128.    In an affidavit filed by Sergeant Steven Hood of the Charleston Police Department, he noted that Ms. Doe 2 had sustained bruising throughout her body from the incident.

129.    Ms. Doe 2 became suicidal while in the hospital and was transferred to the psychiatric unit where she remained for three days.

130.    Following the incident, Ms. Doe 2 has been treating with a therapist who specializes in sexual assaults.

131.    Ms. Doe 2 continues to have suicidal ideation.

A.    **CITY OF CHARLESTON ORDINANCE FOR TRANSPORTATION NETWORK DRIVERS**

132.    On June 1, 2015, Charleston's new ordinance relating to transportation services became effective.  The ordinance specifically addresses Uber drivers, referred to as Transportation Network drivers ("TND"), and requires that all TND apply and receive a business license through the City of Charleston if they are picking up passengers in the city.

133.    The Charleston ordinance also requires that each vehicle for hire must have the state mandated minimum coverage of liability insurance, and drivers are required to provide this information to an officer upon request during any lawful contact.

134.    Additionally, all vehicles used for hire to transport passengers must be registered with the City of Charleston and display a government-issued sticker on the rear window of the vehicle.  After June 1, 2015, these regulations applied to all taxicabs, limos and TND vehicles that pick up passengers in the city.

135.    Upon information and belief, on August 9, 2015, Aiello failed to have a business license, the required commercial insurance or display the City of Charleston sticker in the rear window of his vehicle.

136.    Upon information and belief, on August 9, 2015, despite failing to comply with local laws, Uber permitted Aiello to receive compensation as an Uber driver and to hold himself out to the public, including to Ms. Doe 2 and her friend, as a lawfully employed Uber driver.

VII.    **Terms and Conditions of the Uber App**

    A.    **Customers Are Not Required to or Asked to Read the Terms and Conditions of the Uber App**

137.    At all relevant times, including when Plaintiffs downloaded the Uber App, when a prospective customer signs up for Uber's services, she is prompted to enter information into a few screens.

138.    On the first screen, she is prompted to enter her email, a mobile phone number, and a password.  There is "helper text" at the bottom of the screen that provides an explanation for why the information sought in the form is needed, stating: "We use your email and mobile number to send you ride confirmations and receipts."

139.    On the second screen, she is then also prompted to enter her full name and a photo.  The helper text on this screen states: "Your name and photo helps your driver identify you at pickup."

*Complaint for Damages*                              *Doe 1, et al. v. Uber Technologies, Inc.*

140.    On the final screen, she is prompted to enter a credit card number.  The helper text on this screen states: "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy."

141.    Importantly, there is no indication to the prospective customer that the text of "Terms & Conditions and Privacy Policy" is a link that can be clicked and that will lead to the full text of the Terms and Conditions.

142.    There is no information about the "Terms & Conditions and Privacy Policy" on the user's screen and no prompt is provided to suggest that the user *should* open any link.

143.    Indeed, the text "Terms & Conditions and Privacy Policy" is in a lighter, lower contrast font as compared to the other helper text, further obscuring its significance.

144.    The helper text on each of the three screens is in an identical location – toward the bottom of the screen.

145.    On each screen, the prospective customer merely needs to enter information into the fields, and then to select the "Next" button at the top of the screen.

146.    To advance past the final screen, where the credit card number is entered, again, there is no requirement to review the Terms & Conditions and Privacy Policy.

147.    Instead, the button at the top of the screen merely says "Done" and only indicates advancing through the process for each screen.

**B.**   **Jane Doe 1 and Jane Doe 2 Did Not Agree to the Terms and Conditions**

148.    At no point did Ms. Doe 1 or Ms. Doe 2 assent or agree to the Terms and Conditions to the Uber App.

*Complaint for Damages*                                   *Doe 1, et al. v. Uber Technologies, Inc.*

149.     There is no statement that clicking "Done" signifies assent to the purported contract implied in the Terms and Conditions.

150.     Once the prospective customer advances through the third screen, where she has entered her credit card number, she has created an account with Uber and the application is complete.

151.     There is no indication that by selecting the "Done" button on the final screen, the prospective customer is also assenting to the Terms and Conditions, or even any clear indication that selecting "Next" is the final step to account creation.

152.     At no point has she been required to open a link to the Terms and Conditions.

153.     At no point has she been required to view the Terms and Conditions.

154.     At no point has she been required to check a box that says "I Agree" to the Terms and Conditions.

155.     At no point has she been required to indicate that she has assented to the Terms and Conditions.

156.     At no point has she been required to affirm that she has even read the Terms and Conditions.

157.     The full text of the Terms and Conditions are never provided to the prospective customer during the process of signing up for an account.

158.     The Terms and Conditions are never emailed to the prospective customer, at account creation or otherwise.

159.     The Terms and Conditions are never mailed to the prospective customer, at account creation or otherwise.

*Complaint for Damages*                    *Doe 1, et al. v. Uber Technologies, Inc.*

160.    During the account creation process, the prospective customer can only click through an optional link to view the Terms and Conditions through the screen on which the credit card number is entered.

161.    Once the account is created, to access the Terms and Conditions within the App, a customer is required to click first on a menu button, sift through multiple pages and links in order to find a "Legal" link under the menu sidebar.

162.    Once in the "Legal" section, a customer can access some version of Uber's Terms and Conditions.

163.    After clicking on "Terms & Conditions" in the App, *the default set of terms and conditions that comes up is for Australia.*

164.    The font in which the Terms and Conditions are printed is microscopic.

165.    The default Terms and Conditions consist of 4,604 words and 68 paragraphs of legalese.

166.    To access Terms and Conditions that would purportedly bind individuals in countries other than Australia, one must identify and then use a drop-down menu to find the relevant country.

167.    There is no direct link to Uber's Terms and Conditions on the homepage of the Company's website.

168.    In order to find the Terms and Conditions, one must first click on a sidebar labeled "Menu."  The Terms and Conditions are not available through links such as "About Us," "Safety" or "Help Center."

169.     Indeed, typing in "Terms and Conditions" into the search field in "Help Center" only yields the result of "Gift Cards Terms and Conditions."

170.     In order to find the Terms and Conditions, a prospective user must sift through multiple pages and links in order to find the "Legal" link under the "Menu" sidebar.

171.     The Terms and Conditions to which a prospective customer in the United States would be bound has buried within it an arbitration provision under numbered item 6 – "Dispute Resolution."

172.     When viewing the Terms and Conditions in the App, a user must scroll through approximately seven (7) full pages of microscopic text to reach the "Dispute Resolution" provision.

**C.     Jane Doe 1 and Jane Doe 2 Never Assented to the Terms and Conditions and They Are Not Binding on Them**

173.     Based on the foregoing, Plaintiffs were not provided conspicuous notice of the existence of alleged contract terms when they downloaded the App.

174.     At all relevant times, Plaintiffs were not required to, and nor did they, review the Terms and Conditions of the Uber App.

175.     Similarly, Plaintiffs were not required to, and nor did they, click the link and review the provisions located within the "Terms & Conditions and Privacy Policy."

176.     Plaintiffs were not required to check a box that affirmed that they "agreed" to the Terms and Conditions when they downloaded the App.

177.      Uber failed to properly notify users, including Plaintiffs, when modifications were made to the Terms and Conditions. Through their continued use of the App, Plaintiffs were

*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

not required to, and nor did they, affirmatively agree to the Terms and Conditions of the Uber App.

178.    At all relevant times, Uber never mailed or emailed Plaintiffs a copy of the Terms and Conditions.

**D.    Uber Retained the Right to Unilaterally Change the Terms and Conditions of the App**

179.    At all relevant times, including when Plaintiffs downloaded the Uber App, the Terms and Conditions contained language purporting to grant Uber the unilateral right to modify the agreement.

180.    Pursuant to the Terms and Conditions, Uber provided itself with the exclusive ability to alter allegedly binding agreement terms and simultaneously removed any obligation to send notice to users regarding modifications.

181.    Instead, Uber simply included a provision in the Terms and Conditions that contractual changes are effective once posted on its website, http://www.uber.com/legal.

182.    In the Terms and Conditions, Uber requires arbitration for any claims that arise out of the use of the App.  It excludes from arbitration claims any brought "to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights."

183.    Upon information and belief, Uber's arbitration provision excludes the types of claims Uber is most likely to bring against others, while requiring arbitration for the types of claims most likely to be brought against Uber.

184.    Recovery is also severely limited by Uber's Terms and Conditions.

*Complaint for Damages*                                                    *Doe 1, et al. v. Uber Technologies, Inc.*

185.    According to the Terms and Conditions, Uber's liability for any and all damages and losses incurred cannot exceed $500.00.

**VIII.  Several Recently Reported Incidents of Sexual and Other Assaults by Uber Drivers, Largely Against Female Passengers, Indicate Systemic Deficiencies Regarding Uber's Safety Measures Concerning Drivers**

186.    Sadly, the instant Plaintiffs' sexual assaults were not isolated attacks by two lone Uber drivers on two unsuspecting passengers, but just part of a pattern of similarly heinous, but avoidable attacks.

187.    Upon information and belief, over thirty different sexual assaults by Uber drivers against Uber passengers have been reported in the media in the last two years alone, with the below paragraphs providing a mere overview.

188.    On or around August 22, 2015, Efren Madrigal ("Madrigal"), a newly minted Uber driver who had been on the road for only three days, was accused of raping a passenger in New Jersey.  The female passenger and a friend had initially invited Madrigal in to play cards and chat after he picked them up through Uber and dropped them off at the victim's home.  The friendly encounter rapidly became dangerous, however, as Madrigal allegedly then proceeded to assault the woman who had ridden with him.  Uber stated that the incident was "deplorable" and that Madrigal was blocked "as soon as [Uber was] made aware of the allegations."

189.    In August 2015, a female Uber rider in Dallas alleged that she was raped by her Uber driver.  In circumstances eerily similar to those alleged in the incident in Delhi, India in December 2014, the driver had previously been convicted of a number of felonies and yet had been approved to drive for Uber.  The driver allegedly followed her into her apartment and raped

her there.  Uber later issued details regarding the investigation it undertook of the driver and admitted to improperly permitting him to drive for the Company.

190.    In Chengdu, China, a female passenger reported that she had been robbed at knifepoint and then sexually assaulted by her Uber driver in August 2015.  The passenger ordered the ride at around 2:00 a.m., but the ride quickly took a turn as she claimed that upon entering a tunnel, the driver stopped and threatened her with a knife.  She then asserted that the Uber driver took her to a secluded area where he proceeded to sexually assault her, taking photos and threatening to expose her if she reported the incident to the police.  Uber's Chengdu and Guangzhou offices were previously raided in May 2015 by local authorities to investigate operations.

191.    On April 30, 2015, a female Uber rider in New York City alleged that she was sexually assaulted and groped by her Uber driver.  After falling asleep during the ride, she claims that she awoke to her driver caressing her face, after which he grabbed her face and leaned in for a kiss.  Fortunately, she was able to escape, but stated that "If I hadn't pushed him away, then I'm pretty certain he would have done more."

192.    In late April 2015, a University of Southern California student accused an Uber driver of raping her while she was unconscious, unaware, and unable to consent to any sexual acts.  Ironically, in March 2015, the University had issued a crime alert about an alleged sexual assault and recommended that students use Uber to stay safe.  That language was excluded from the campus alert sent out after the April incident.

193.    Also in late April 2015, two women were allegedly assaulted in Madison, Wisconsin by their Uber driver(s).  Similar to the circumstances after the Delhi alleged assault,

*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

local officials expressed frustration that Uber refused to turn over information about the driver(s) that would help hold them responsible.

194.    On February 6, 2015, in Philadelphia, Pennsylvania, a female rider alleges that she was raped and kidnapped by her Uber driver.  According to a police report, the Uber driver held her down, ripped her pants, raped her, and then held her captive, continuing to drive her around for nearly two hours, refusing to let her out of the car.  Uber claims that it was unaware of any such incident until forty days after the victim first reported the alleged sexual assault.  Indeed, the Uber driver remained on the road, continuing to drive for Uber, for the duration of that time.

195.    In Houston, Texas, in January 2015, an Uber driver, Duncan E. Burton ("Burton"), allegedly raped a female rider who was unconscious, unaware, and unable to consent to any sexual acts.  Burton had previously been convicted of a felony, which Uber's supposedly "state of the art" background check either failed to flag, or did flag, but did not cause Uber to withhold account creation.

196.    Also in January 2015, in Paris, France, an Uber driver, after dropping off the friends of the final passenger, allegedly forced a female rider to perform oral sex on him.  He was subsequently arrested and charged with sexually assaulting the passenger.  In mid-March 2015, Parisian police officers raided Uber's Paris offices as part of an investigation into the UberPop service.

197.    In December 2014, a known sexual predator, Shiv Kumar Yadav ("Yadav"), was accused of kidnapping and brutally raping a female driver after she had fallen asleep during her ride.  Despite Uber's purportedly robust background check system, Yadav, who had a long

history of sexual assault arrests, was able to use a forged driving certificate to become a driver. Just a few days prior to the alleged assault, Uber had been notified by another female driver that Yadav was behaving inappropriately towards her, and Uber did nothing.  After the alleged assault, Yadav was permitted to evade the authorities for days due to Uber's lack of organization on the ground.

198.    In December 2014, an Uber driver in Los Angeles allegedly attempted to grab and kiss a female rider, who happened to be South African singer/songwriter Nikki Williams, on her driveway.  Ms. Williams was able to fight him off and run inside her house.

199.    Also in Washington D.C., in December 2012, an Uber driver allegedly grabbed a 20-year-old female rider from behind as she exited the car, knocked her to the ground causing her head to hit the concrete, and then raped her.

200.    Similarly, in June 2014, an Uber driver in Los Angeles named Frederick Dencer ("Dencer") was arrested for allegedly kidnapping a female passenger who awoke in a motel room and found Dencer shirtless.  The passenger accused Dencer, who had been hanging out in front of the nightclub the passenger came out of after dropping off another fare, of fondling her through her clothes.

201.    Furthermore, on August 14, 2014, an Uber driver in Washington D.C. was accused of sexually assaulting a passenger in the back of his Uber car.  The passenger accused the driver of touching her while she was asleep in the car.

202.    Likewise, in September 2014, an Uber driver in Orlando, Florida was arrested after a female passenger accused him of grabbing her breast and fondling it in an aggressive

*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

manner.  The driver was accused of repeatedly commenting on her appearance before stopping the car and shoving his hand in her tank top to fondle her breast.

203.    Moreover, in an incident remarkably analogous to Jane Doe 1's, at approximately 7:30 p.m. on December 6, 2014 in Boston, Massachusetts, Uber driver Alejandro Done ("Done") allegedly pulled up to a residence and picked up a young woman waiting for the pre-arranged driver.  The woman had been out with friends and decided to use a car service to get home.  Done picked up the woman and allegedly drove to a location that she was not familiar with, pulled over to a secluded area and jumped in the backseat, struck her with his hands, strangled her, locked the car doors so that she could not escape, and sexually assaulted the woman.

204.    In addition, in July 2014, an Uber driver from Chicago named Adnan Nafasat ("Nafasat"), was accused of sexually assaulting a 21-year-old man, who he allegedly overpowered and choked after also asking him to sit in the front of his car.  Nafasat allegedly told the man that he was not going home, and that nobody knew where he was, before grabbing the man and touching his penis over his pants, and forcing his tongue and finger into the man's mouth.  Nafasat allegedly held the man's throat so tight that he almost lost consciousness.  When Nafasat stopped the car, he unzipped his pants and allegedly tried to force the man's head onto his groin.

205.    Upon information and belief, in addition to these reported cases that made the news in the U.S., similar sexual assaults by Uber drivers have occurred in other countries where Uber operates.

206.    Numerous other accusations of violent assaults and kidnappings by Uber drivers against customers have surfaced.

*Complaint for Damages*                              *Doe 1, et al. v. Uber Technologies, Inc.*

207.     In March 2013, a Washington D.C. Uber driver named Hamza Abu Shariah was sued for spitting in the face of and slapping a customer after ranting and yelling about how he hates Americans and homosexuals and a number of other derogatory comments.

208.     In September 2013, a Washington D.C. Uber driver was accused by Bridget Todd, a writer, activist and former lecturer at Howard University, of grabbing her out of his car by the throat and choking her.  In emails to Uber employees in response to this incident, Uber CEO Travis Kalanick apparently blamed the media for thinking that Uber is "somehow liable for these incidents that aren't even real in the first place," but stressed that Uber needed to "make sure these writers don't come away thinking we are responsible even when things do go bad."

209.     Moreover, in November 2013, an Uber customer named James Alva ("Alva") accused a San Francisco Uber driver, whose vehicle license plate did not match the plate of the car that appeared on Alva's Uber App, of assaulting him after hurling homophobic and racist slurs.  When asked about this incident, Uber spokesperson Andrew Noyes confirmed that the driver in question was in fact an Uber driver, but insisted that "[Uber is] a technology platform that connects riders and providers, so it's not our job to investigate."

210.     Likewise, in June 2014, a San Francisco Uber driver named Daveea Whitmire ("Whitmire") was charged with battery stemming from a fight he had with a passenger in which Whitmire allegedly punched a passenger in the head and elbowed him in the chest.  Surprisingly, it was later revealed that Whitmire should not have even been driving for Uber given the Company's "zero-tolerance" policy for alcohol and drug-related offenses and his 2009 felony conviction for selling marijuana, 2012 felony charge for selling cocaine, and battery charge that he was on probation for at the time he was working for Uber.

211.    Additionally, in September 2014, a San Francisco man was attacked in the face with a hammer by an Uber driver named Patrick Karajah ("Karajah").  Karajah was charged with two felony counts of assault and battery.  The victim needed reconstructive surgery after his skull was fractured, and was in serious danger of losing an eye.

212.    Furthermore, in September 2014, an Uber driver in Atlanta, Georgia was accused of pulling a gun on a valet parking attendant, pointing the gun at the attendant, and threatening to kill him.

213.    The above examples are just a sampling of the number of accusations of violent and aggressive behavior made against Uber drivers by unsuspecting customers, which are no surprise given Uber's hollow commitment to customer safety, as exemplified by Plaintiffs' harrowing ordeals.

## IX.    Uber's Perpetration of Fraud and Misleading Advertising

214.    This lawsuit seeks to compensate Jane Doe 1 and Jane Doe 2 for the sexual assaults that they suffered due to Uber's inadequate and disingenuous "commitment to safety."

215.    Uber, in line with its slogan of "Expanding Globally," aggressively and intentionally disregarded years of policy and regulation controlling the Boston and Charleston taxi infrastructures.

216.    Had Uber not sacrificed rider safety for the sake of profit and expansion, and actually cared about who it was employing to drive its cars rather than being preoccupied with racing to control its share of the taxi market, at the expense of existing taxi companies and consumers, Plaintiffs would not have been viciously attacked.

*Complaint for Damages*                    *Doe 1, et al. v. Uber Technologies, Inc.*

217.    Uber has and continues to knowingly mislead the public about the safety and security measures it employs to ensure even basic levels of customer safety.

218.    Riders, such as Plaintiffs, reasonably relied on Uber's representations and promises about its safety and security measures, including its driver screening and background check procedures.  Uber's riders, including Plaintiffs, choose to utilize Uber's taxi services as a result of this reliance.

219.    For instance, after visiting Uber's website before signing up for the Uber App, Plaintiffs were aware of Uber's multiple promises to consumers that customer safety was a priority.  Among those statements, *inter alia*, were the following:

> (a) *"Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road.  That means setting the strictest safety standards possible, then working hard to improve them every day. The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security - what we're doing in the US is an example of our standards around the world."*

> (b) *"From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind."*

> (c) *"Making cities better is at the heart of everything we do. It's much more than improving the way people get around.  It's celebrating what makes those cities special, caring about the people who make them great, and being responsible citizens. That's why we work hard to keep our streets safe for everyone, whether they're on foot, on a bike, or in another car."*

220.    Plaintiffs relied on these representations and rode in vehicles driven by Uber drivers, including the rides during which they were sexually assaulted.

*Complaint for Damages*                                                    *Doe 1, et al. v. Uber Technologies, Inc.*

221.     Uber knew that its representations and promises about rider safety were false and misleading, yet continued to allow its riders to believe in the truth of its representations and promises, and to profit from its riders' reliance on such representations and promises.

222.     Unsurprisingly, in the United States, despite its proclamations that customer safety is its top priority, Uber has actively pushed back against legislation and other measures requiring strong background checks for its drivers out of the public's view.

223.     For instance, according to media accounts, in Colorado, Uber persuaded lawmakers to ease drivers' background checks in a bill legalizing ridesharing companies, including abolishing FBI background checks and fingerprint checks.

224.     Similarly, media reports indicate that in Illinois, Uber lobbied Governor Pat Quinn to veto a bill that would have forced Uber to strengthen background checks.

225.     And in California, Uber is alleged to have helped defeat a law that would have required drivers to undergo a background check by the state's Justice Department, as is required of taxi drivers.

226.     In addition, Uber has been repeatedly sued for its deceptive practices regarding background checks.  For instance, the district attorneys of San Francisco and Los Angeles recently filed suit against Uber alleging that the Company had misled customers about its background checks by misrepresenting the extent to which Uber screens drivers.

227.     Furthermore, a class action lawsuit was filed recently against Uber alleging that the Company misrepresents its $1 "Safe Rides Fee" for UberX rides, as well as the nature of its background checks and safety measures taken on behalf of riders.  The lawsuit alleges that Uber's background checks and other safety measures fall well short of industry standards despite

the Company referring to its practices as "industry-leading" on its website.  The suit alleges that,

unlike many background checks, Uber does not require fingerprints, or even for the applicant to

appear in person, and also that the Company allows drivers to simply transmit photographs of

vehicles rather than performing inspections.

**X.     Plaintiffs Seek Immediate Injunctive Relief Ordering Uber to Affirmatively
         Overhaul Its Woefully Inadequate Safety Measures, So That No Woman Has to
         Ever Endure What They Have Had to Unfortunately Experience**

228.     The foregoing negligent and fraudulent behavior on the part of Uber demonstrates

that the Company must take immediate action to improve the safety of its customers, which has

sadly played second-fiddle thus far in the Company's quest to "expand" globally and reap

profits.

229.     Accordingly, Uber must promptly implement the following improved safety

measures:

a.   Open dedicated, full-service 24/7 customer support centers in every city in which
     Uber operates, which will have ready access to all Uber employee records and
     Uber ride tracking information;

b.   Require all Uber drivers nationwide to install GPS tracking systems in their cars,
     which immediately trigger alarms if they are deactivated or malfunction;

c.   Disable child-lock features on passenger doors of Uber vehicles;

d.   Require all Uber drivers nationwide to undergo in-person screening interviews
     and vehicle examinations;

e.   Install tamper-proof video cameras in all Uber cars which immediately set off
     alarms if they are disabled or malfunction;

f.   Provide customers with the option of requesting a female Uber driver;

g.   Perform periodic and annual national criminal background checks of all drivers;

*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

h.   Perform thorough character checks on prospective drivers that go beyond mere criminal background checks, such as by interacting with people who may personally know an applicant, in order to learn about the person's reputation and background;

i.   Make driver photos available for all customers nationwide to view on their phones to guard against identity fraud;

j.   Disable sharing of driver profiles by associating each profile with a particular phone and/or fingerprint, verified at the in-person screening interview;

k.   Engage professional, trained, third-party investigators to perform audits of all current driver employment applications and other required documentation to identify inaccurate, outdated or forged information;

l.   Utilize Live Scan, a fingerprint-based background check for drivers administered through the Department of Justice and FBI databases for all current and prospective Uber drivers;

m.   Bar registered sex offenders or individuals with assault or rape convictions (no time limit) from becoming Uber drivers;

n.   Install in-App panic buttons that send messages to Uber customer support, local police, and a designated safety contact to quickly report an escalating safety situation, such as aggressive driving, a possible abduction, or an assault;

o.   Code and install a masking function to ensure that the real phone numbers of customers are not shared with drivers;

p.   Employ teams of experts dedicated to investigating complaints against Uber drivers of a violent or sexual nature; and

q.   Create a separate online form to report complaints of a violent or sexual nature against Uber drivers.

230.   These proposed safety measures are reasonable and necessary (and some have even been partially implemented since a prior lawsuit seeking similar injunctive relief was instituted[2]), and many would likely have prevented Plaintiffs' sexual assaults.  As such, these

---

[2]   *See* Doe v. Uber Technologies Inc., No. 3:15-cv-424 (SI) (Complaint filed January 29, 2015).

changes must be fully implemented without delay, so that Plaintiffs' harrowing ordeals are never repeated.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE, NEGLIGENT HIRING, NEGLIGENT SUPERVISION, AND NEGLIGENT RETENTION)

231.    Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

232.    Uber owed Plaintiffs and the general public a duty of reasonable care in the hiring, training and supervision of its drivers.

233.    Uber did breach that duty of care in the hiring, retention and/or supervision of Dakiri and Aiello, who were unfit to be providers of transportation, and who were not adequately trained or supervised in their driving and conduct with customers.  Uber knew or should have known that they would be a danger to passengers and lead to a risk of the very type of danger and harm that occurred on February 7, 2015 and August 9, 2015.

234.    As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Defendant, Plaintiffs sustained serious injuries.

235.    Defendant knew or reasonably should have known that Dakiri and Aiello were unfit and employed them with a conscious disregard of the rights or safety of others, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

236.    The conduct of Defendant Uber was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

237.     Accordingly, Plaintiffs are entitled to recovery against Defendant in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (FRAUD)

238.     Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

239.     Defendant made intentional misrepresentations of fact to Plaintiffs known by Defendant to be false, to wit, that Plaintiffs would be safely taking Uber rides with drivers whose backgrounds had been screened by Uber, and who would provide them with safe passages, but who, in reality, Defendant had not screened, and who were grave threats to Plaintiffs' safety and well-being.

240.     Defendant made these misrepresentations to Plaintiffs despite knowing that it had not adequately screened its drivers.

241.     Defendant further fraudulently misrepresented to Plaintiffs that the Company had the ability to and would in fact accurately track Dakiri's and Aiello's transports of Plaintiffs from where they were picked up to their destinations.

242.     In addition to false representations that its transports were monitored, Uber fraudulently concealed the fact that its drivers had the ability to go off-grid simply by turning off the cellular phone in use.

243.     Uber's false statements concerning its safety measures detailed herein were made knowingly, or with a willful, wanton and reckless disregard for the truth, and intended to deceive and defraud Plaintiffs into agreeing to utilize Uber's services.

*Complaint for Damages*                              *Doe 1, et al. v. Uber Technologies, Inc.*

244.   Defendant made these misrepresentations with the intent to cause Plaintiffs to rely on this false information and induce them into utilizing Uber's services, in spite of the concerns Plaintiffs had about their safety.

245.   Plaintiffs actually and reasonably relied on the false facts and misrepresentations provided by Defendant when they agreed to utilize Uber's services, after being told that Uber had screened Dakiri and Aiello, and that they would provide them with safe passages.

246.   As a result of Defendant's deliberate misrepresentations of material facts, Plaintiffs suffered significant damages.

247.   Accordingly, Plaintiffs are entitled to recovery against Defendant in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (BATTERY)

248.   Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

249.   The violent acts committed against Plaintiffs by Defendant's employees while they were performing their job duties, including their sexual assaults of Plaintiffs, amounted to a series of harmful and offensive contacts to Plaintiffs' persons, all of which were done intentionally and without Plaintiffs' consent.

250.   Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*.  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and vigilance of a very cautious

person.  They must do all that human care, vigilance and foresight reasonably can do under the circumstances to avoid harm to passengers.  While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business. Defendant breached its duty of care in its actions towards Plaintiffs.

251.     As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

252.     As a direct and proximate result of the aforementioned conduct, Plaintiffs have incurred medical expenses and other economic damages.

253.     The conduct of Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

254.     Accordingly, Plaintiffs are entitled to recovery against Defendant in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### (ASSAULT)

255.     Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

256.     The violent acts committed against Plaintiffs by Defendant's employees while they were performing their job duties, including their sexual assaults of Plaintiffs, amounted to a series of events creating a reasonable apprehension in Plaintiffs of immediate harmful or

*Complaint for Damages*                              *Doe 1, et al. v. Uber Technologies, Inc.*

offensive contact to Plaintiffs' persons, all of which were done intentionally and without Plaintiffs' consent.

257.    Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*.  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and have the vigilance of a very cautious person.  They must do all that human care, vigilance and foresight reasonably can do under the circumstances to avoid harm to passengers.  While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business.  Defendant breached its duty of care in its actions towards Plaintiffs.

258.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

259.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have incurred medical expenses and other economic damages.

260.    The conduct of Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

*Complaint for Damages*                                    *Doe 1, et al. v. Uber Technologies, Inc.*

261.    Accordingly, Plaintiffs are entitled to recovery against Defendant in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(FALSE IMPRISONMENT)**

262.    Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

263.    Defendant's employees, while they were performing their job duties, would not let Jane Doe 1 and Jane Doe 2 exit their cars.  As a result, Ms. Doe 1 and Ms. Doe 2 were confined in cars against their will for a significant period of time.

264.    During their confinements, Jane Doe 1 and Jane Doe 2 feared for their safety.

265.    Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*.  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and vigilance of a very cautious person.  They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers.  While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and practical operation of the business.  Defendant breached its duty of care in its actions towards Plaintiffs.

266.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

267.     As a direct and proximate result of the aforementioned conduct, Plaintiffs have incurred medical expenses and other economic damages.

268.     The conduct of Uber was engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

269.     Accordingly, Plaintiffs are entitled to recovery against Defendant in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

270.     Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

271.     Defendant's employees, while carrying out their job duties, engaged in conduct toward Plaintiffs that is extreme and outrageous so as to exceed the bounds of decency in a civilized society, namely, they violently sexually attacked innocent women inside Uber taxis.

272.     Defendant is liable for the actions of its agents and employees directly and under the doctrine of *respondeat superior*.  Defendant is a common carrier who must carry passengers safely.  As a common carrier, Defendant is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.  Common carriers must use the highest care and vigilance of a very cautious person.  They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers.  While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe

transportation, in view of the transportation used and practical operation of the business. Defendant breached its duty of care in its actions towards Plaintiffs.

273.     By their actions and conduct, Defendant's employees intended to and did intentionally and recklessly cause Plaintiffs to suffer severe emotional distress.

274.     As a direct and proximate result of Defendant's employees' conduct, Plaintiffs have suffered, and continue to suffer, severe emotional distress, for which they are entitled to an award of damages.

275.     The conduct of Uber was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

276.     Accordingly, Plaintiffs are entitled to recovery against Defendant in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

277.     Plaintiffs reallege and reassert each of the preceding paragraphs as if fully set forth herein.

278.     Defendant's conduct was extreme and outrageous, taken with the intent to cause or in disregard of a substantial probability of causing severe emotional distress to Plaintiffs, and in fact did cause them severe emotional distress.

279.     The aforementioned events took place due to the negligent acts and/or omissions of Defendant and its agents, servants, employees and or licensees, all of whom were acting

*Complaint for Damages*                                        *Doe 1, et al. v. Uber Technologies, Inc.*

within the scope of their authority, within the scope of and in furtherance of their employment, and in furtherance of their agency.

280.    By reason of Defendant's negligent conduct, Plaintiffs suffered serious emotional distress.

281.    As a result of Defendant's negligent conduct, Plaintiffs have suffered and continue to suffer injuries and damages.

282.    The conduct of Defendant was also engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs herein, so as to warrant the imposition of punitive damages pursuant to California Civil Code Section 3294.

283.    Accordingly, Plaintiffs are entitled to recovery against Defendant in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of California and any other applicable jurisdiction within the United States of America;

B.    An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.    Enter a permanent injunction directing that Uber take all affirmative steps necessary to remedy the effects of the unlawful conduct alleged in this Complaint, and to prevent

*Complaint for Damages*                              *Doe 1, et al. v. Uber Technologies, Inc.*

repeated occurrences in the future;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all physical, monetary and/or economic harm; for harm to her professional and personal reputations and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for mental anguish and physical injuries; all other monetary and/or non-monetary losses suffered by Plaintiffs;

E.      An award of punitive damages;

F.      An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

G.      Such other and further relief as the Court may deem just and proper.

*Complaint for Damages*                                        *Doe 1, et al. v. Uber Technologies, Inc.*

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: October 8, 2015
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Douglas H. Wigdor
Jeanne M. Christensen
Tanvir H. Rahman
Elizabeth J. Chen

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
jchristensen@wigdorlaw.com
trahman@wigdorlaw.com
echen@wigdorlaw.com

**ANDERSON & POOLE, P.C.**

By: _____
Jamie C. Couche

601 California Street, Suite 1300
San Francisco, CA 94108
Tel.: (415) 956-6413
Fax: (415) 956-6416
jcouche@adplaw.com

*Counsel for Plaintiffs*

Page **52** of **52**

*Complaint for Damages*                    *Doe 1, et al. v. Uber Technologies, Inc.*