DOUGLAS H. WIGDOR (NY SBN 2609469)
JEANNE M. CHRISTENSEN (NY SBN 2622124)
TANVIR H. RAHMAN (NY SBN 4921235)
ELIZABETH J. CHEN (NY SBN 5126214)
(All admitted *pro hac vice*)
**WIGDOR LLP**
85 Fifth Avenue, Fifth Floor
New York, NY 10003
Tel.: (212) 257-6800
Fax: (212) 257-6845

JAMIE C. COUCHE (SBN 252001)
**ANDERSON & POOLE, P.C.**
601 California Street, Suite 1300
San Francisco, CA 94108
Tel.: (415) 956-6413
Fax: (415) 956-6416

Attorneys for Plaintiffs,
**JANE DOE 1 and JANE DOE 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2,<br><br>Plaintiffs,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | Case No.: 3:15-cv-04670-SI<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Hearing Date: April 1, 2016<br>Time: 9:00 a.m.<br>Courtroom: 1, 17th Floor<br><br>Before the Hon. Susan Illston |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 3

III. ARGUMENT ........ 4

A. Legal Standard ........ 4

B. Dakiri and Aiello Were Employees of Uber ........ 5

C. Uber Owed a Higher Duty of Care to Plaintiffs as a Common Carrier ........ 8

D. Plaintiffs Have Pleaded Sufficient Facts Under a *Respondeat Superior* Theory of Liability ........ 11

1. Uber Is Liable for Sexual Assaults Committed By Dakiri and Aiello ........ 11

a. Uber Is Liable for Sexual Assaults Committed By Dakiri and Aiello ........ 12

i. Uber Knew Sexual Assault Was a Risk ........ 13

ii. The Complaint Does Not Allege That Jane Doe 2's Driver Was Off-Duty ........ 15

E. Uber Knew or Should Have Known That Dakiri and Aiello Were Unfit Employees ........ 15

F. Uber Has Fraudulently Misled Its Riders and Plaintiffs Have More Than Sufficiently Pleaded Facts in Support of Fraud ........ 18

1. Plaintiffs Factually Detail the Fraud and Misrepresentation Perpetrated by Uber ........ 19

2. Plaintiffs Include Statements in Support of the Fraud ........ 21

3. Uber Fails to Disclose That it Does Not Monitor Rides with Live GPS Tracking ....................23

G. Punitive Damages Are Warranted ....................24

H. Amendment ....................25

IV. CONCLUSION ....................25

# TABLE OF AUTHORITIES

**Cases** **Page**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 4, 15

*Ayala v. Antelope Valley Newspapers Inc.*,
327 P.3d 165 (Cal. 2014) ..... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 4

*Berwick v. Uber Technologies, Inc.*,
No. CGC-15-546378 (Cal. App. Dep't Super. Ct. June 15, 2015) ..... 7

*City and Cnty. of San Francisco v. Superior Court*,
31 Cal. App. 4th 45 (Cal. App. 1 Dist. 1994) ..... 10

*Coker v. Georgia*,
433 U.S. 584 (1977) ..... 11

*Cromwell v. Los Angeles Ry. Corp.*,
102 Cal. App. 499 (Ct. App. 3 Dist. 1929) ..... 10

*Dayton v. Yellow Cab Co. of San Francisco*,
85 Cal. App. 2d 740 (Cal. Dist. Ct. App. 3 Dist. 1948) ..... 9

*Delfino v. Agilent Techs., Inc.*,
145 Cal. App. 4th 790 (Cal. App. 6 Dist. 2006) ..... 16

*Doe I v. Wal-Mart Stores, Inc.*,
572 F.3d 677 (9th Cir. 2009) ..... 5

*Elijahjuan v. Superior Court*,
210 Cal. App. 4th 15 (Cal. App. 2 Dist. 2012) ..... 7, 8

*Estrada v. FedEx Ground Package System, Inc.*,
154 Cal. App. 4th 1 (Cal. App. 2 Dist. 2007) ..... 5, 7

*Evan F. v. Hughson United Methodist Church*,
8 Cal. App. 4th 828 (1992) ..... 16

*F.D.I.C. v. Cashman*,
No. C 11-03334(SI), 2011 WL 6002611 (N.D. Cal. Nov. 30, 2011) ..... 16, 25

*Far West Financial Corp. v. D & S Co.*,
46 Cal. 3d 796 (1988) ........ 16

*Farmers Ins. Group v. County of Santa Clara*,
11 Cal. 4th 992 (1995) ........ 12

*Federico v. Superior Court*,
59 Cal. App. 4th 1207 (Cal. App. 3 Dist. 1997) ........ 18

*Ferguson v. Horizon Lines, Inc.*,
Case No. CV11-3391 MEJ, 2012 WL 5519201 (N.D. Cal. Nov. 14 2012) ........ 14

*Grieves v. Superior Court*,
157 Cal. App. 3d 159 (Cal. App. 4 Dist. 1984) ........ 25

*Homedics, Inc. v. Valley Forge Ins. Co.*,
315 F.3d 1135 (9th Cir. 2003) ........ 4, 5

*In re Napster, Inc. Copyright Litig.*,
479 F.3d 1078 (9th Cir. 2007) ........ 19

*Jefferson v. Kellogg Sales Co.*,
No. C08-04132(SI), 2008 WL 4862511 (N.D. Cal. Nov. 11, 2008) ........ 25

*Johnson v. Fed. Home Loan Mortgage Corp.*,
793 F.3d 1005 (9th Cir. 2015) ........ 17

*Jordan v. Paul Financial, LLC*,
745 F. Supp. 2d 1086 (N.D. Cal. 2010) ........ 19, 22

*Juarez v. Boy Scouts of America, Inc.*,
81 Cal. App. 4th 377 (Cal. App. 1 Dist. 2000) ........ 18

*Kase v. Ebert*,
392 S.C. 57 (S.C. Ct. App. 2011) ........ 17, 18

*L.A. Taxi Cooperative, Inc. v. Uber Technologies Inc.*,
114 F. Supp. 3d 852 (N.D. Cal. 2015) ........ 22

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*,
12 Cal. 4th 291 (1995) ........ 11, 12, 14

*Little v. Los Angeles Ry. Corp.*,
94 Cal. App. 303 (Cal. App. 3 Dist. 1928) ........ 10

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ........ 25

*Lopez v. Southern California Rapid Transit District*,
40 Cal. 3d 780 (1985) ........ 10

*Mary M. v. The City of Los Angeles*,
54 Cal. 3d 202 (1991) ........ 11

*Neubauer v. Disneyland, Inc.*,
875 F. Supp. 672 (C.D. Cal. 1995) ........ 8

*O'Connor v. Uber Technologies, Inc.*,
82 F. Supp. 3d 1133 (N.D. Cal. 2015) ........ 6, 8

*O'Connor v. Uber Technologies, Inc.*,
No. C-13-3826(EMC), 2013 WL 6354534 (N.D. Cal. Dec. 5, 2013) ........ 6, 7

*Phillips v. TLC Plumbing, Inc.*,
172 Cal. App. 4th 1133 (Cal. App. 4 Dist. 2009) ........ 18

*Randolph v. City of E. Palo Alto*,
No. C 06-07476(SI), 2007 WL 1232057 (N.D. Cal. Apr. 26, 2007) ........ 5

*Russo v. APL Marine Services, Ltd.*,
No. 2:14-cv-03184(ODW)(JCG), 2014 WL 3506009 (C.D. Cal. July 14, 2014) ........ 12, 14

*S.G. Borello & Sons, Inc. v. Dep't of Ind'l Relations*,
48 Cal. 3d 341 (1989) ........ 6

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) ........ 5

*Semegen v. Weidner*,
780 F.2d 727 (9th Cir. 1985) ........ 18, 19

*Serv. Employees Int'l Union v. County of L.A.*,
225 Cal. App. 3d 761 (Cal. App. 2 Dist. 1990) ........ 5

*Silvas v. E*Trade Mortgage Corp.*,
514 F.3d 1001 (9th Cir. 2008) ........ 4

*Squaw Valley Ski Corp. v. Superior Court*,
2 Cal. App. 4th 1499 (Cal. App. 3 Dist. 1992) ........ 8, 9

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) ........ 25

*The People of the State of California v. Uber Technologies, Inc.*,
No. 14-cv-543120(CGC) (Cal. Sup. Ct., filed Aug. 18, 2015) ........ 23

*U.S. v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ........ 17

*Usher v. City of Los Angeles*,
828 F.2d 556 (9th Cir. 1987) ........ 4

*Western Reserve Oil & Gas Co. v. New*,
765 F.2d 1428 (9th Cir. 1985) ........ 4

*Xue Lu v. Powell*,
621 F.3d 944 (9th Cir. 2010) ........ 11, 12, 14

**Statutes**

CAL. CIV. CODE §§ 1564 *et seq*. ........ 4

CAL. CIV. CODE § 2100 ........ 8

CAL. CIV. CODE § 3294 ........ 24, 25

S.F. TRANS. CODE ART. 1100 § 1113 (m)(1) ........ 14

**Rules**

FRCP 9(b) ........ 18, 21

FRCP 12(b)(6) ........ 2, 4

**Other Authorities**

Kevin Conlon & Nick Valencia, *Kalamazoo Uber Driver Picked Up Fares Between Killings, Source Says* ........ 2

Plaintiffs Jane Doe 1 and Jane Doe 2 ("Plaintiffs") by and through undersigned counsel, hereby respectfully submit this memorandum of law in opposition to the motion to dismiss for failure to state a claim filed by Defendant Uber Technologies, Inc. ("Uber," the "Company" or "Defendant").

## I. INTRODUCTION

Plaintiffs Jane Doe 1 and Jane Doe 2 filed this action in connection with the unlawful rape and sexual assaults to which they were subjected during their rides arranged through Uber with drivers employed by Uber, on February 7, 2015, and August 9, 2015, respectively.

As detailed below, the tragedies in this case result from policies at the core of Uber's "ridesharing" business model. The Company cannot escape legal responsibility for the harm suffered by Plaintiffs. Uber is an enterprise that holds itself out to the general public as a private transportation company. But unlike taxis and other private for-hire transportation companies, Uber operates throughout the U.S. without complying with state or municipal safety and licensing regulations, including rules regulating drivers. Uber flouts the laws designed to ensure safe transportation but also fails to implement meaningful, enforceable standards of its own. The result for individual consumers is disastrous.

Despite being in the business of transporting people, and the heightened duty owed to riders required by this relationship, Uber refuses to monitor or supervise its drivers, including during the transportation of riders. From the second that an Uber driver gets into his car and turns on the Uber smartphone application called "Uber" (the "App") to wait for his first hail by a customer using their App, the Company has no control over or knowledge of what conduct that driver will engage in. For instance, an Uber driver can accept one hail and then wait for his next hail while sitting in a bar. What this Uber driver does during the time spent waiting for hails, as

well as during the transport of a rider, is unknown to Uber. The driver could be sitting in a bar drinking alcohol for two hours or as evident by the recent tragedy in Kalamazoo, Michigan, a driver could be accepting hails between engaging in a mass shooting.[1]

Uber cannot have it both ways. It wants to reap the financial rewards modern technology offers but operate outside modern safety laws. If Uber opts to profit by escaping from the financially onerous rules that govern taxis and other for-hire vehicles and their drivers, it cannot also disclaim responsibility for conduct from these drivers. Simply labeling Uber drivers as "independent contractors" does not shift liability exposure onto consumers.

Safety is the heart of what Uber sells. But the promise of a "safe ride" is false and misleading when Uber's business model is premised on cutting corners on safety and regulatory measures to deliver as many rides as possible. Plaintiffs relied on Uber's deceptive assurances of a safe and secure ride, only to learn that they fell within a calculated profit/risk analysis as a result of the decision to skimp on hiring protocols, including criminal background checks. It is manifestly unjust for Uber to profit off its untrue promises of safe rides at the expense of customers, primarily women, who are placed in harm's way by entrusting themselves to Uber.

Denying responsibility, Uber filed a motion to dismiss all alleged causes of action pursuant to Fed. R. Civ. P. ("FRCP") 12(b)(6), on the basis that Plaintiffs fail to plead facts that state a plausible claim for relief. As detailed below, however, Plaintiffs allege more facts than are necessary to state plausible claims for relief, and Uber's motion to dismiss must fail in its entirety.

---

[1] *See* Kevin Conlon & Nick Valencia, *Kalamazoo Uber Driver Picked Up Fares Between Killings, Source Says*, CNN (Feb. 22, 2016), *available at* http://www.cnn.com/2016/02/21/us/michigan-kalamazoo-county-shooting-spree/.

## II. STATEMENT OF FACTS

Uber describes itself as a "transportation network company." (Dkt. No. 46, Compl. at ¶ 23).[2] Through the App, individuals make a transportation request and are matched with an Uber driver who transports them to their requested destination. *Id.* App users must pay for the ride through the App with a credit card. *Id.* Uber pays the driver a share of the fare collected, and retains the remainder. *Id.* As evident, Uber drivers are employees who transport individuals from one place to another for a fee.

Uber views safety as a cornerstone of the service it sells. ¶¶ 2, 6, 8, 70. Management at Uber has chosen to sell safety rather than actually provide it, and the Company's policies reflect that choice. ¶¶ 9-10, 34. The Company's advertising is littered with images of glamorous women exiting its black cars who are intended to appear "safe." ¶ 69. In contrast, Uber's background check process for drivers is cursory and does not require: biometric fingerprint analysis, in-person interviews of applicants, physical vehicle inspections, trainings for drivers on how to prevent sexual harassment, or any number of additional safety features. ¶ 67.

Plaintiffs believed and relied upon Uber's misrepresentations regarding safety in selecting Uber rides. ¶¶ 67-75, 233-237. Unfortunately for Plaintiffs, such reliance was to their detriment, resulting in their sexual assaults. ¶¶ 13, 231-237. During both of their rides, Plaintiffs were riding alone with their drivers (¶¶86-87, 131-133), late at night (¶¶ 84, 128-132), after drinking alcohol (¶¶ 80-81, 83, 111, 119). The drivers took advantage of their situational control and Plaintiffs' isolation, and sexually assaulted Plaintiffs. Both drivers, older and physically dominant, had no trouble overpowering Plaintiffs. ¶ 89 (Jane Doe 1 was 20 years of age, and

---

[2] All citations to the operative Complaint (Dkt. No. 46) are denoted as "¶ __."

weighed less than 100 pounds, while Abderrahim Dakiri ("Dakiri") was approximately 38 years of age, 6'3" and weighed more than 200 pounds); (Jane Doe 2 was likewise physically overpowered by Patrick J. Aiello ("Aiello")). Instead of receiving the "safest rides on the road" from fully screened, vetted drivers, Plaintiffs entrusted their safety to Uber, which "vetted," approved, and hired an individual previously convicted of a domestic violence assault charge, and an individual whose criminal record could not fully be ascertained. ¶¶ 7, 100, 115, 233-237.

Plaintiffs bring claims for fraud pursuant to CAL. CIV. CODE §§ 1564 *et seq.*, as well as negligence; negligent hiring, supervision and retention; battery; assault; false imprisonment; and intentional infliction of emotional distress under California common law.

## III. ARGUMENT

### A. Legal Standard

In reviewing a motion to dismiss pursuant to FRCP 12(b)(6), "the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987) (citing *Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1430 (9th Cir. 1985), *cert. denied*, 474 U.S. 1056 (1986)). To survive a motion to dismiss, a complaint "must plead 'enough facts to state a claim to relief that is plausible on its face,'" and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In addition, "A complaint must not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Silvas v. E*Trade Mortgage Corp.*, 514 F.3d 1001, 1003-04 (9th Cir. 2008) (citing *Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d

1135, 1138 (9th Cir. 2003)). "The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim." *Randolph v. City of E. Palo Alto*, No. C 06-07476(SI), 2007 WL 1232057, at *2 (N.D. Cal. Apr. 26, 2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

**B. <u>Dakiri and Aiello Were Employees of Uber</u>**

As a preliminary matter, Dakiri and Aiello, as Uber drivers, were the Company's employees. Defendant argues that Dakiri and Aiello were not employees of Uber, citing extensively from the Company's agreement with its drivers, but largely ignoring the clear, controlling case law in the context of the ample facts pleaded. Regardless of the labels or language included in the agreements unilaterally drafted by Uber that drivers are required to sign as a condition of their employment, Uber drivers are employees.

In determining whether an individual is an employee or an independent contractor, under California law, "[t]he key factor to consider in analyzing whether an entity is an employer is 'the right to control and direct the activities of the person rendering service, or the manner and method in which the work is performed.'" *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682 (9th Cir. 2009) (quoting *Serv. Employees Int'l Union v. County of L.A.*, 225 Cal. App. 3d 761, 769 (Cal. App. 2 Dist. 1990)). "The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship." *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1, 10-11 (Cal. App. 2 Dist. 2007). The California Supreme Court has highlighted that the relevant inquiry is "not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." *Ayala v. Antelope Valley Newspapers Inc.*, 327 P.3d 165, 172 (Cal. 2014) (citation omitted) (emphases in original). Moreover, control is viewed in light of the "employer's 'right to discharge at will, without cause' [as] 'strong evidence in

support of an employment relationship.'" *O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133, 1139 (N.D. Cal. 2015) (citing *S.G. Borello & Sons, Inc. v. Dep't of Ind'l Relations*, 48 Cal. 3d 341, 350 (1989)). And it bears noting that in this District, The Honorable Edward M. Chen has already found that whether Uber drivers are employees or independent contractors is a question of fact for a jury to decide, not to be presumed upon a motion to dismiss, or even evaluated as a matter of law upon a motion for summary judgment. *See O'Connor v. Uber Technologies, Inc.*, No. C-13-3826(EMC), 2013 WL 6354534, at *6 (N.D. Cal. Dec. 5, 2013) (finding that Plaintiffs had pleaded enough facts to warrant discovery on the issue); *O'Connor*, 82 F. Supp. 3d at 1145-46 (finding the inquiry to be a mixed factual/legal one for a jury to decide).

Here, Plaintiffs have pleaded more than sufficient facts for the Court to ultimately find that Dakiri and Aiello were Uber's employees. Plaintiffs have alleged, *inter alia*, that: Uber does not charge drivers a fee to become employees (¶ 37); Uber does not charge drivers to use the App (¶ 38); Uber executives set fare rates, drivers have no input on fares charged, and drivers have no ability to negotiate fares with customers (¶ 39); the Company can modify charges if a driver takes a circuitous route (¶ 40); Uber collects between 20-30% of the fee per ride (¶ 41); Uber considers its customer lists to be proprietary information and thus its drivers are prohibited from answering rider inquiries about booking rides outside of the App (¶ 42); Uber has the power to terminate drivers with or without cause (¶ 43); Uber drivers are required to accept all ride requests while they are logged into the App and "Drivers who reject too many ride requests risk facing discipline, including suspension or termination" (¶ 44); Uber seeks uniformity among its drivers, requiring professional dress, sending customers text messages when one to two minutes away from the pickup location, playing soft jazz or NPR on the radio, and more (¶ 45); Uber uses

rider feedback to discipline and/or terminate drivers (¶ 46); and Uber guarantees drivers salaries in some locations, including minimums in Charleston, South Carolina in September 2015 and January 2016 (¶¶ 47-48).

Each of these facts, as alleged, is sufficient at the pleading stage for the Court to find that Dakiri and Aiello were employees of Uber. They allege substantial control over the day-to-day responsibilities of the drivers, and the unilateral power to terminate a driver's employment, both for cause and without cause.[3] The question of whether an individual is an employee or an independent contractor is a fact-intensive one, and thus Plaintiffs should be entitled to take discovery to offer evidence in support of their claims. *See O'Connor*, 2013 WL 6354534, at *6 (citing *Estrada*, 154 Cal. App. 4th at 11) ("Generally, the employee determination is a question of fact that depends on the evidence presented.")).

While Uber attempts to rely solely on the text of the agreements between Uber and the drivers to establish the employer-independent contractor relationship, its reliance on *Elijahjuan v. Superior Court*, 210 Cal. App. 4th 15 (Cal. App. 2 Dist. 2012) is inapposite.[4] First, the sole issue before the court in *Elijahjuan* was "whether the parties agreed to arbitrate their dispute" on the issue of whether the respondent had misclassified the petitioners as independent contractors

[3] Additionally, on June 3, 2015, the California Labor Commission Office (the "Commission") ruled that former San Francisco Uber driver Barbara Berwick was an employee, not an independent contractor, and ordered Uber to pay Berwick her owed employee expenses, including mileage fees and tolls. As in this action, Uber claimed that it was not a "transportation provider." The Commission disagreed and held that Uber is "in business to provide transportation service to passengers," and therefore, was a transportation company. *See* Petition at 8, *Berwick v. Uber Technologies, Inc.*, No. CGC-15-546378 (Cal. App. Dep't Super. Ct. June 15, 2015).

[4] In support of its motion to dismiss, Uber cites to pages 31-32 of the decision in *Elijahjuan*, 210 Cal. App. 4th 15. However, this portion of the opinion is the dissent by Justice Grimes and is in direct contrast with the majority's ruling.

rather than employees. *Id.* at 17. Second, the court held that the agreement between the parties was not determinative on the issue of employee classification because, "even though the Agreements state that petitioners are independent contractors, the label placed by the parties on their relationship is not dispositive." *Id.* at 23 (citations and quotations omitted). Therefore, *Elijahjuan*, in accordance with precedent and other recent decisions in this District, supports Plaintiffs' position, not Uber's, that the facts here demonstrate an employer-employee relationship, and at a minimum, would require a jury to evaluate such an inquiry. *Id.* at 23-24; *see also O'Connor*, 82 F. Supp. 3d at 1149-52.

### C. Uber Owed a Higher Duty of Care to Plaintiffs as a Common Carrier

Under California law, a "common carrier" is required to "use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." CAL. CIV. CODE § 2100. "[T]he California statutory common carrier definition is very broad." *Neubauer v. Disneyland, Inc.*, 875 F. Supp. 672, 673 (C.D. Cal. 1995). Whether a party can be considered a common carrier is only a matter of law when the material facts are *not* in dispute. *See Squaw Valley Ski Corp. v. Superior Court*, 2 Cal. App. 4th 1499, 1506 (Cal. App. 3 Dist. 1992). "[A] common carrier within the meaning of Civil Code section 2168 is any entity which holds itself out to the public generally and indifferently to transport goods or persons from place to place for profit." *Id.* at 1508. A common carrier relationship is not terminated solely by virtue of the end of a ride – indeed, "While they still remain in each other's presence actively carrying on the dispute the passenger is not 'discharged' under the contract of carriage, and the carrier, its agents or employees are still bound to exercise the highest degree of care in refraining from initiative conduct which would

jeopardize the passengers' safety." *Dayton v. Yellow Cab Co. of San Francisco*, 85 Cal. App. 2d 740, 745 (Cal. Dist. Ct. App. 3 Dist. 1948).

Here, despite Defendant's conclusory assertion to the contrary (Dkt. No. 49, Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def's Mem.") at p. 13), Plaintiffs have pleaded more than sufficient facts for the Court to find that Uber is a common carrier as defined by the statute. Plaintiffs have alleged that: "Uber is available to the general public" (¶ 24); Uber "charges standardized fees (subject to multipliers during "surge pricing" periods) to customers … in the same way that a traditional taxi company does" (*id*.); and that Uber, as of the end of 2015, was projected to have generated $10 billion in revenue (¶ 27). Each of these facts speaks directly to the factors that make a particular enterprise a common carrier. Uber has held itself out to the general public to transport persons for profit. *See Squaw Valley Ski Corporation*, 2 Cal. App. 4th at 1508.

And in fact, *Dayton*, cited by Defendant for the proposition that an "an employer cannot be liable for employee misconduct outside the scope of employment" actually *supports* Plaintiffs' theory of the case. Defendant claims that any duty that Uber may or may not have had to Jane Doe 2 would have terminated upon the conclusion of the first Uber ride she took with Aiello. But as Plaintiff Doe 2 has alleged, similar to the facts in *Dayton*, her ride with Aiello involving the assault and rape was a continuation of her ride, and there was an ongoing fee dispute as to how Aiello was to be paid. ¶¶ 128, 135. *See Dayton*, 85 Cal. App. 2d at 745 ("the rule of utmost care and diligence set forth in Civil Code, section 2100, still applies and would include the case of a dispute over the fare between a cab driver and a passenger").

The determination of whether a transportation provider is a common carrier is a question of fact when the parties dispute the facts that would go to show the status. While Defendant

argues that the status would not “displace the rule that an employer cannot be liable for employee misconduct outside the scope of employment,” which Plaintiffs also contest in Part III.D, *infra*, the cases cited support a finding that Uber is a common carrier. *See Little v. Los Angeles Ry. Corp.*, 94 Cal. App. 303, 311 (Cal. App. 3 Dist. 1928) (it is an “elementary proposition” that even in the case of a common-carrier railway, a conductor’s tort that “does not fall within the scope of such duties, cannot bind the defendant” railway company “**if physical injury or other damage to a passenger or other person or his property be directly caused thereby**”). At no point have Plaintiffs alleged that their injuries alleged were caused by themselves. In addition, other cases cited can easily be distinguished. *See Cromwell v. Los Angeles Ry. Corp.*, 102 Cal. App. 499, 500-01 (Ct. App. 3 Dist. 1929) (finding *at the conclusion of a jury trial* that common-carrier railway is not liable for the torts of a conductor acting outside his scope of employment); *City and Cnty. of San Francisco v. Superior Court*, 31 Cal. App. 4th 45, 49 (Cal. App. 1 Dist. 1994) (affirming a decision *upon summary judgment* that “[n]o California case has held a common carrier liable for a sudden assault which occurs with no warning”); *Lopez v. Southern California Rapid Transit District*, 40 Cal. 3d 780 (1985) (reversing a grant of a motion to dismiss in the context of a passenger attacking another passenger). Here, Plaintiffs have alleged that the drivers assaulted them within the scope of the drivers’ employment, and that Uber knew or should have known about the possibility of such assaults had adequate investigation occurred. ¶¶ 36-66.

### D. Plaintiffs Have Pleaded Sufficient Facts Under a *Respondeat Superior* Theory of Liability

#### 1. Uber Is Liable for Sexual Assaults Committed By Dakiri and Aiello

As explained in greater detail *supra*, Dakiri and Aiello are employees of Uber and as such, Uber is vicariously liable for their actions. Because both Dakiri and Aiello were acting within the scope of their employment as Uber drivers when the sexual assaults occurred, Uber is liable. Uber claims that as a matter of law, it is not responsible for Plaintiffs' damages because sexual assaults, including the assaults in this case, are inherently outside the scope of employment.[5] (Def's Mem. at pp. 9-10). Clearly, the violent and abhorrent act of sexual assault and rape is unrelated to any assigned duty of an Uber driver.[6] This fact, however, does not unilaterally excuse Uber from responsibility as a matter of law. *See, e.g.*, *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010) (holding that it is well established in California that "an employee's willful, malicious and even criminal torts may fall within the scope of his or her employment, even though the employer has not authorized the employee to commit crimes or intentional torts"); *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 296 (1995). Indeed, the question of scope of employment in this case is necessarily fact intensive. However, for purposes of pleading, Plaintiffs sufficiently allege that the conduct of Dakiri and Aiello was reasonably foreseeable and the risk of the sexual assault was sufficiently related to their employment, such that Uber is responsible.

---

[5] Uber also denies accountability because it claims that it is not a "transportation provider" and therefore cannot employ drivers. But a transportation provider is exactly what Uber is, and drivers hired to transport riders are Uber's employees.

[6] In *Mary M. v. The City of Los Angeles*, 54 Cal. 3d 202 (1991), Justice Arabian, in a concurring opinion, reasons that rape, by its very nature "displays a total contempt for the personal integrity and autonomy of the victim; short of homicide, it is the ultimate violation of self." *Id.* at 222-24 (quoting *Coker v. Georgia*, 433 U.S. 584, 597 (1977)).

**(a) Uber Can Be Held Liable for Negligent and Intentional Acts of Employees**

In California, under *respondeat superior*, an employer may be held liable for both negligent and intentional acts of employees. *Xue Lu*, 621 F.3d at 948-49. Of course, Uber *expects* its drivers to obey the law when providing transportation, but the relevant question is whether it was reasonable for Uber to foresee that some drivers may abuse their positions for their own benefit, including perpetrating a sexual assault. The answer is unquestionably, "yes."

In *Lisa M.*, the court explained that for purposes of *respondeat superior*, an intentional tort is foreseeable, if:

> [I]n the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. The question is not one of statistical frequency, but of a relationship between the nature of the work involved and the type of tort committed. The employment must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought.

12 Cal. 4th 291, 302 (citations and quotations omitted); *see also Farmers Ins. Group v. County of Santa Clara*, 11 Cal. 4th 992, 1004 (1995) (the rule has been formulated as a form of enterprise liability; losses which foreseeably result from the conduct of the enterprise, "should be allocated to the enterprise as a cost of doing business.") (citations omitted); *Russo v. APL Marine Services, Ltd.*, No. 2:14-cv-03184(ODW)(JCG), 2014 WL 3506009, at *5 (C.D. Cal. July 14, 2014) (a multi-factor test is necessary to determine foreseeability of an employee's conduct).

Applying this standard to the relationship between the nature of the work involved as an Uber driver and the sexual assaults that occurred, Uber was clearly aware of the risk that this type of harm could occur.[7]

**i. <u>Uber Knew Sexual Assault Was a Risk</u>**

Although Uber is prevented virtually everywhere from using the word "cab" or "taxi" in relation to its services, the fact is that the Company performs the exact same service as taxicab companies. Drivers are hired to transport individuals from one place to another. Inherent in this relationship is the understanding that drivers are entrusted with the personal safety of the riders they are paid to transport. Plaintiffs, both young, petite women travelling alone late at night, relied on Uber's representations that its drivers would provide a safe means of transport. Trusting Uber, Plaintiffs entered Dakiri's and Aiello's vehicles with the reasonable expectation of a ride home, not that they were at an increased risk of sexual assault and exploitation.

The facts alleged in the Complaint make clear that each driver facilitated his sexual assault by exploiting the very situation that his employment with Uber provided. ¶¶ 82-101, 110-145. Within the context of the rides, Dakiri and Aiello had complete control of their vehicles, including the ability to veer off route or into a secluded area. Each driver also had the ability to lock their car doors, preventing the young women from exiting. Importantly, the drivers knew that Uber had no way to monitor or supervise their conduct during these rides.

---

[7] Uber's false claims of "customer safety" are central to Plaintiffs' arguments in this case that the Company is liable for the conduct of its drivers. If Uber truly believed that certain risk factors do not expose female riders to a greater likelihood of sexual assault, then there would be no need for its extensive campaign directed towards women to convince them that it carefully screens potential hires for past criminal records.

Indeed, if an Uber driver simply turns off his App, whether during a ride or not, Uber has no mechanisms in place to contact the driver or further track his activity.

Although Uber could easily require drivers to use in-vehicle cameras or live GPS tracking systems, as a matter of policy, Uber does not require such safety precautions. As alleged in the Complaint, this is an intentional, cost-cutting decision by Uber that is a routine requirement for regulated taxis and for-hire transportation providers in most cities.[8] ¶ 233. In sum, in the context of Uber's ridesharing enterprise, the likelihood of a driver committing a sexual assault on a passenger is "not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Lisa M.*, 12 Cal. 4th at 296; *Xue Lu*, 621 F.3d at 948.

Uber placed Plaintiffs in vulnerable situations that Uber knew were probable and could have prevented. ¶¶ 7-13, 67-70, and *passim*. Under the facts of this case, Plaintiffs should be permitted to proceed to discovery. See *Russo*, 2014 WL 3506009 at *5 (case involving sexual assault; "whether an employee has acted within the scope of employment presents a question of fact…and defendant presents no authority…that as a matter of law, vicarious liability does not attach to [an employer] for a [supervisor's] sexual battery" of an employee)); *Ferguson v. Horizon Lines, Inc.*, Case No. CV11-3391 MEJ, 2012 WL 5519201, at *3 (N.D. Cal. Nov. 14 2012) (case permitted to summary judgment where employee accused of sexual assault).

---

[8] By way of example only, S.F. TRANS. CODE ART. 1100 § 1113 (m)(1) mandates that all taxis are equipped with an operational security camera manufactured after 2006.

**ii. <u>The Complaint Does Not Allege that Jane Doe 2's Driver Was Off-Duty</u>**

On several occasions, Uber claims that dismissal is warranted because Plaintiffs "concede that Jane Doe 2's ride was not requested or accepted using the Uber App, and thus not provided on the Uber platform." Def's Mem. at pp. 17-18, 23. Uber also misrepresents that Plaintiffs allege Aiello was "off-duty" at the time of the rape. *Id.* At no time does the Complaint allege such facts and Plaintiffs strongly disagree with these assertions. Rather, at this stage in the litigation, no discovery has been conducted and only Uber is in possession of documents and evidence surrounding Aiello's conduct immediately before, during and after transporting Jane Doe 2. Whether the drivers were acting within the scope of their employment with Uber when Plaintiffs were assaulted is a material issue of fact in dispute in this case. Included in this fact inquiry is the question whether Aiello was acting with express or apparent authority as an agent of Uber. ¶¶ 113-139.

**E. <u>Uber Knew or Should Have Known That Dakiri and Aiello Were Unfit Employees</u>**

Uber is directly liable for its own negligent hiring, retention, and supervision of Dakiri and Aiello as the Company should have known about dangers the drivers posed. Defendant argues that Plaintiffs have "failed to establish an employer-employee relationship" or that the "alleged assaults were within the scope of any such relationship." Def's Mem. at p. 14. As the Court is aware, on a motion to dismiss, the burden on Plaintiffs is not to establish facts, but simply to have pleaded facts that "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. After full discovery, including depositions, Uber will have a complete record from which to file a motion for summary judgment should it believe it appropriate. Moreover, Plaintiffs have pleaded more than sufficient facts regarding the employer-employee relationship,

as well as the assaults having occurred within the scope of any such relationship. *See* Parts III.B and III.D, *supra*.

Under California law, an employer can be liable for its own negligence in hiring, retaining, or supervising an employee who is incompetent or unfit for a position. *See Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (Cal. App. 6 Dist. 2006). "Negligence liability will be imposed upon the employer if it knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." *F.D.I.C. v. Cashman*, No. C 11-03334(SI), 2011 WL 6002611, at *4 (N.D. Cal. Nov. 30, 2011) (emphasis added). The California Supreme Court has held that an employer can be liable on the basis of action or inaction, such as the negligent hiring of an agent or the failure to provide adequate supervision of the agent's work. *See Far West Financial Corp. v. D & S Co.*, 46 Cal. 3d 796, 812 (1988). Actual knowledge of the unfitness of an employee is not required. *See Evan F. v. Hughson United Methodist Church*, 8 Cal. App. 4th 828, 843 (1992) (finding triable issue of fact over whether employer had "failed to use reasonable care in investigating" employee despite no actual knowledge of unfitness).

Plaintiffs have pleaded numerous facts in support of the proposition that Uber failed to fully investigate Dakiri and Aiello. With respect to Dakiri, Plaintiffs have alleged that Uber's background check process altogether fails at any semblance of investigation into Dakiri's history. Plaintiffs allege that Dakiri has been in the country for less than three years. ¶ 100. Plaintiffs further allege that Uber's background check vendor should have performed more extensive searches beyond mere U.S.-based credit checks. ¶ 251. Plaintiffs contend that Uber failed to use reasonable care in investigating Dakiri's background, and thus they should be entitled to discovery to determine exactly what Uber did know about Dakiri. Indeed, Uber is in

sole possession of the information it had about Dakiri prior to hiring him. Similarly, Uber is the only party with access to information regarding rider reviews of Dakiri, including whether riders reported possible misconduct.

As to Aiello, Plaintiffs have alleged that he was previously convicted of a domestic violence related assault charge. ¶ 115.[9] Uber makes further assertions that the conviction "could have been expunged," (Def's Mem. at p. 15), but at no point have Plaintiffs alleged such a fact. Finally, Uber makes the inexplicable argument that a domestic violence-related assault conviction, that is, a crime of violence based on gender, could not possibly have put Uber on notice that Aiello would commit rape against a passenger, which similarly is a crime of violence based on gender. *See* Def's Mem. at p. 16. Such an argument is not only unavailing, but also dependent on a fact-intensive inquiry into the similarity of crimes, and how notice is to be construed. Moreover, the South Carolina case that Uber cites in support of its argument occurs under entirely distinguishable circumstances. *Kase v. Ebert*, 392 S.C. 57 (S.C. Ct. App. 2011). First, the procedural posture of the case is an appeal from summary judgment, and as such, the court in *Kase* had the benefit of a full record from which to draw. *Id.* at 61. Second, the driver

[9] Defendant submits a document purporting to describe Aiello's conviction in support of the instant motion to dismiss (Dkt. No 51-5). If a district court considers evidence outside the pleadings, a Rule 12(b)(6) motion to dismiss must be converted to a Rule 56 motion for summary judgment, and the nonmoving party must be given an opportunity to respond. *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). Based on the extensive discovery yet to be completed, however, Plaintiffs do *not* seek conversion of the instant motion to one for summary judgment. Moreover, absent additional authentication, Plaintiffs do not concede the authenticity of the document submitted. Nor do Plaintiffs concede that the Complaint necessarily relies upon it, as the document presented by Defendant does not reflect the full nature of the conviction. *See Johnson v. Fed. Home Loan Mortgage Corp.*, 793 F.3d 1005, 1007-08 (9th Cir. 2015) ("Although as a general rule we may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, we may consider extrinsic evidence not attached to the complaint **if the document's authenticity is not contested and the plaintiff's complaint necessarily relies on it**.) (emphasis added).

in *Kase* physically assaulted a third party who had attacked him in retaliation for the driver having hit the third party's vehicle, not a rider in his vehicle. *Id.* at 59.

Uber's cases are inapposite as they are premised on a summary judgment standard, in which the parties have had an opportunity to fully develop a factual record from which to make arguments. *See Juarez v. Boy Scouts of America, Inc.*, 81 Cal. App. 4th 377, 395 (Cal. App. 1 Dist. 2000) (decided on summary judgment); *Phillips v. TLC Plumbing, Inc.*, 172 Cal. App. 4th 1133, 1146 (Cal. App. 4 Dist. 2009) (decided on summary judgment); *Federico v. Superior Court*, 59 Cal. App. 4th 1207, 1216 (Cal. App. 3 Dist. 1997) (decided on summary judgment). Here, where the parties have not had the opportunity to engage in discovery to which they are entitled, applying a summary judgment standard would be inappropriate. Uber is well within its rights to argue that Dakiri and/or Aiello would not be covered employees, or that Uber could not have reason to know that they should not have been hired following the development of an evidentiary record, but that argument would only be appropriate at summary judgment or at trial.

### F. Uber Has Fraudulently Misled Its Riders and Plaintiffs Have More Than Sufficiently Pleaded Facts In Support of Fraud

Plaintiffs allege that Uber made knowing, willful misrepresentations to potential riders, including Plaintiffs, relating to safety measures, including background screening and oversight of drivers, with the intent to cause riders, and Plaintiffs, to rely on this false information and induce them into utilizing Uber's services. ¶¶ 235-237. Pursuant to FRCP 9(b), "a party must state with particularity the circumstances constituting fraud." However, the rule requires only that the allegations be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.

1985). Uber claims that Plaintiffs' fraud claims fail as a matter of law because they do not detail how the misrepresentations alleged were, in fact "false," and that allegations must contain the "who, what, when, where and how" of the fraud. Def.'s Mem. at p. 16. The Company is wrong, however, because Plaintiffs specify in detail the "who, what, when, where and how" of the misrepresentations relied upon by Plaintiffs to their detriment, and have properly placed Uber on notice of the precise misconduct with which they are charged.

**1. Plaintiffs Factually Detail the Fraud and Misrepresentation Perpetrated by Uber**

The Company's conduct rises to the level of fraud against riders because Uber knew, and continues to know, that its representations and promises about rider safety were false and misleading, yet it continued to allow its riders to believe in the truth of its representations and promises, and to profit from its riders' reliance on such representations and promises. A claim for fraud under California law requires that a plaintiff plead "'(a) misrepresentation; (b) knowledge of falsity (or scienter); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting in damage.'" *Jordan v. Paul Financial, LLC*, 745 F. Supp. 2d 1086, 1094 (N.D. Cal. 2010) (quoting *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1096 (9th Cir. 2007)).

In satisfaction of (a) through (c) above, Plaintiffs detail facts throughout the Complaint showing that Uber intentionally engages in "relentless marketing efforts" to misrepresent to potential riders that the Company provides the "safest rides on the road." ¶¶ 2, 6, 8, 67-75 and *passim*. In fact, the Complaint alleges that Uber aggressively and knowingly misrepresents the truth about the safety of riders in a uniform marketing campaign that spans more than 100 cities in the U.S. Despite Uber's intimate knowledge of the risks and potential dangers associated with

allowing non-professional drivers access to transport individual consumers, such as Plaintiffs, without any supervision, Uber's deceptive and fraudulent policies and practices involve *inter alia*, the following:

- From the very highest levels of the Company including director, officer, and managing levels, Uber makes an intentional decision to look the other way when reviewing information about potential drivers (¶ 52);
- Uber uses a mechanism for reviewing a potential employee's background that is inherently flawed and cannot actually assure riders of the safety of the driver behind the wheel (*Id.*); and
- For purposes of hiring drivers, Uber's system involves a series of failures to verify information: (i) potential drivers never appear in person for an interview or to submit documents, everything is done through the internet; (ii) only photos of documents must be submitted online, including photos of driver's licenses, vehicle registrations, and insurance cards; (iii) vehicle ownership is never verified; and (iv) drivers are not required to submit fingerprints, only social security numbers. (¶¶ 53-61).

These allegations highlight only some of the known flaws inherent in Uber's due diligence of potential hires. Uber admits, as it must, that at no point in the hiring process does any Uber employee verify that the person applying to be a driver is uploading his own documents. This allows persons using false identifications to apply, and get hired, by Uber. Further, even after a driver is hired, Uber fails to verify that the person who is driving using a certain account in the App is the same person who opened that account. As alleged in the Complaint, "if a potential driver knows that he will be unable to pass even the lenient existing background check, that potential driver could simply ask a friend to share their account information and thus gain access to driving on the platform." ¶ 62.

Uber intentionally fails to verify basic information about drivers, yet claims on its website that "[e]very ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards" (¶ 71), and that "Uber is committed

to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, …within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security."[10] ¶ 70. Accordingly, Plaintiffs more than adequately placed Uber on notice of the fraud and misrepresentations alleged.

**2. <u>Plaintiffs Include Statements in Support of the Fraud</u>**

Plaintiffs allege that they were aware of Uber's multiple promises to potential riders, including themselves, that customer safety was a priority, and relied on such promises to their detriment. ¶ 236. The Complaint includes specific statements relating to the intentional misrepresentations, including:

> (a) Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, then working hard to improve them every day. The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security - what we're doing in the US is an example of our standards around the world.
>
> (b) From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind.
>
> (c) Making cities better is at the heart of everything we do. It's much more than improving the way people get around. It's celebrating what makes those cities special, caring about the people who make them great, and being responsible citizens. That's why we work hard to keep our streets safe for everyone, whether they're on foot, on a bike, or in another car.

---

[10] The fraud allegations are made against Uber. The numerous misleading statements referenced throughout the Complaint make clear that Uber issued such statements publicly, in order to reach potential riders, such as Plaintiffs. To the extent that the Court finds that Plaintiffs failed to identify the source, www.uber.com, or cite to a link with a specific date available on the internet, and thus fail to satisfy FRCP 9(b) without these publicly available links, Plaintiffs respectfully request leave to amend to add such information.

¶ 231. Uber issued these statements to the public. Where fraud is alleged against a corporate entity, to survive a motion to dismiss, Plaintiffs need not specify the names of employees who issued the statements on the company's behalf. *See Jordan*, 745 F. Supp. 2d at 1094 (denying dismissal where the complaint omits the "precise identities of the employees responsible" for the statements and "defendants possess the superior knowledge of who was responsible for crafting these … documents.").

The same statements cited in the Complaint were recently considered by the court in *L.A. Taxi Cooperative, Inc. v. Uber Technologies Inc.*, 114 F. Supp. 3d 852, 860 (N.D. Cal. 2015). Although that action involved allegations of false advertising under the Lanham Act, The Honorable Jon S. Tigar considered the question of whether Uber's statements were false or "likely to mislead or confuse consumers." *Id.* Denying the defendants' motion to dismiss, in part, Judge Tigar reasoned that:

> A reasonable consumer reading these statements in the context of Uber's advertising campaign could conclude that an Uber ride is objectively and measurably safer than a ride provided by a taxi or other competitor service, i.e., it is statistically most likely to keep riders from harm. References to the "strictest safety standards" and explicit comparisons with competitor taxi services reinforce the impression that Uber's statements are grounded in fact.

*Id.* at 861. Before discovery, Plaintiffs' inability to identify the names of Uber employees who disseminated these statements to the public should not warrant dismissal. Uber can easily determine who wrote the statements used in the marketing campaign, and which executives approved the content.

Uber knew, and continues to know, that its hiring procedures are negligent, yet it intentionally marketed to the public that drivers are scrutinized at a very high level, even going

so far as to suggest that Uber's security checks are more stringent than the regulatory laws in most cities and states. ¶ 231. This representation is false, and as Plaintiffs alleged, in a recent complaint filed by the District Attorney of San Francisco and the District Attorney of Los Angeles, *The People of the State of California v. Uber Technologies, Inc.*, No. 14-cv-543120(CGC) (Cal. Sup. Ct., filed Aug. 18, 2015), Uber's security screening is so deficient that, upon information and belief, individuals passed Uber's screening process and were found driving for Uber with the following felony convictions: (1) second degree murder, (2) lewd and lascivious acts against a child under the age of 14, (3) sexual exploitation of children, (4) kidnapping for ransom with a firearm, (5) assault with a firearm, (6) grand theft, (7) robbery, (8) identity theft, (9) burglary, and (10) taking a vehicle without consent. In addition, a number of Uber drivers, upon information and belief, have previously been convicted of driving under the influence and driving with a suspended license and yet still passed Uber's purportedly strict background checks. ¶ 68.

The allegations in the Complaint are sufficiently specific to enable Uber to articulate a defense, and thus the requirements of Rule 9(b) are satisfied. Uber's request to dismiss the claim of fraud should be denied.

### 3. <u>Uber Fails to Disclose That It Does Not Monitor Rides with Live GPS Tracking</u>

Uber argues that Plaintiffs' fraud claims must fail because the Complaint does not sufficiently describe how the misrepresentations relating to tracking rides is misleading. Def's Mem. at p. 23. Uber misconstrues the pleadings on this issue. As another example of Uber's campaign of fraudulently stating to the public that it provides the "safest rides on the road" and that the Company's safety standards often exceed municipal regulations, Uber falsely represents

that it has technology that monitors and tracks Uber drivers while transporting customers, thereby inducing Plaintiffs to use its services. ¶ 261. A real time GPS tracking system, used by taxi companies in cities throughout the U.S., is something that Uber could require drivers to use, but it does not. Contrary to Uber's misquotes, the Complaint does not suggest that Uber monitors drivers with this technology. The Complaint does allege, however, that Uber should commit to such a policy. ¶¶ 245-247.

### G. <u>Punitive Damages Are Warranted</u>

Uber contends that Plaintiffs' claims for punitive damages must be dismissed as inadequately pleaded. Def's Mem. at pp. 24-26. However, for the same reasons set forth *supra* relating to the sufficiency of the pleadings with respect to the causes of action for, *inter alia*, negligence, negligent hiring, retention and supervision, and fraud, Plaintiffs have also pleaded sufficient facts to sustain their claims for punitive damages. Uber alleges that Plaintiffs have not met the pleading requirements set forth in CAL. CIV. CODE § 3294 (b) for punitive damages against a corporate employer. Specifically, Uber argues that dismissal is warranted because Plaintiffs do not identify the Uber executives, officers or agent employees who either perpetrated the fraudulent marketing campaign relating to the safety of Uber rides, or with regard to Dakiri or Aiello, were responsible for vetting their backgrounds and supervising their employment. *Id.* at 25-26. In federal court, "while Section 3294 governs the substantive standard to obtain punitive damages, the Federal Rules of Civil Procedure governs the pleading standard." *Thompson v. Macy's West Stores, Inc.*, No. 12-cv- 02294(WHA), 2010 WL 4761471, at *2, (N.D. Cal. Oct. 5, 2012). Therefore, a complaint's short and plain prayer for punitive damages that is supported by plausible allegations is sufficient to survive a motion to dismiss. *Id.*

Here, Plaintiffs have stated sufficient facts to allege punitive damages liability. CAL. CIV. CODE § 3294 provides that a plaintiff may seek exemplary damages against an employer based upon acts of an employee in several situations, including: "the employer's (1) advance knowledge of the employee's unfitness; (2) authorization or ratification of the wrongful conduct; and (3) personal culpability." *Grieves v. Superior Court*, 157 Cal. App. 3d 159, 167 (Cal. App. 4 Dist. 1984); *see also Jefferson v. Kellogg Sales Co.*, No. C 08-04132(SI), 2008 WL 4862511, at *5 (N.D. Cal. Nov. 11, 2008). Accordingly, Uber's motion to dismiss Plaintiffs' prayer for punitive damages must be denied.

### H. <u>Amendment</u>

"The Ninth Circuit has repeatedly held that 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Cashman*, 2011 WL 6002611, at *2 (citing *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)). "If the court dismisses a claim for failure to meet these standards, it should grant leave to amend unless it is clear that no amendment could possibly cure the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998). Should the Court find that any of Plaintiffs' pleadings require further factual detail, Plaintiffs respectfully request leave to amend. Defendant's assertion that Plaintiffs can plead no further facts "because no such facts exist" is an inherently conclusory statement that baselessly requires the Court to make findings as to what information Plaintiffs do and do not have.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that Defendant's motion to dismiss be dismissed in entirety and for such other and further relief deemed just and proper.

Dated: March 4, 2016
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: ______________________
Douglas H. Wigdor
Jeanne M. Christensen
Tanvir H. Rahman
Elizabeth J. Chen

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
jchristensen@wigdorlaw.com
trahman@wigdorlaw.com
echen@wigdorlaw.com

**ANDERSON & POOLE, P.C.**

Jamie C. Couche

601 California Street, Suite 1300
San Francisco, CA 94108
Tel.: (415) 956-6413
Fax: (415) 956-6416
jcouche@adplaw.com

*Counsel for Plaintiffs*