UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE 1, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>　　　　Defendant. | Case No. 15-cv-04670-SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 49, 52 |

Now before the Court is defendant Uber Technologies, Inc.'s motion to dismiss the Amended Complaint. Docket No. 49. This matter came on for hearing on April 1, 2016. For the reasons set forth below, the Court hereby GRANTS in part and DENIES in part defendant's motion.

**BACKGROUND**

Plaintiffs Jane Doe 1 and Jane Doe 2 bring this tort suit against Uber Technologies, Inc. ("Uber") for sexual assaults that plaintiffs allege they suffered at the hands of Uber drivers. The following allegations are drawn from plaintiffs' Amended Complaint.

Since 2010, Uber has operated as a "transportation network company." Docket No. 46, Amended Complaint ("AC") ¶ 23. Individuals download Uber's smartphone application and then use the "App" to make a transportation request. *Id*. ¶¶ 1, 23. "They are then matched with an Uber driver who picks them up and drives them to a destination. App users must pay for the ride through the App with a credit card. Uber pays the driver a share of the fare collected, and retains the remainder." *Id*. ¶ 23.

Uber solicits and retains non-professional drivers to provide the car rides that customers

order through the Uber App. *Id*. ¶ 25. One who wishes to drive for Uber applies online and uploads photos of a driver's license, vehicle registration, and proof of insurance. *Id*. ¶53. Uber then performs a background check through a third party company. *Id*. ¶¶ 58, 66. This check runs the driver's social security number through a database, capturing information dating back seven years. *Id*. ¶¶ 59, 66. Once Uber approves a driver, that driver is available to the public to provide transportation services through the App. *Id*. ¶ 25. Neither drivers nor riders pay a fee to download the Uber App. *Id*. ¶ 29. "Uber's sole source of revenue is from charges to riders for trips taken." *Id*.

In February 2015, in Boston, Massachusetts, Doe 1 and her friends used the Uber App to arrange a car ride after they had gone to dinner and then to a party. *Id*. ¶¶ 82-84. Uber driver Abderrahim Dakiri confirmed that he was on his way, and picked up Doe 1 and her friends. *Id*. ¶¶ 11, 85. After Dakiri dropped off Doe 1's friends first, Doe 1 gave Dakiri the address of her destination. *Id*. ¶ 86. Dakiri then began to sexually assault Doe 1. *Id*. ¶¶ 88-92. Dakiri did not take a direct route to Doe 1's destination but drove more than 15 minutes off route "in order to increase his opportunity to sexually assault her." *Id*. ¶ 93. Dakiri parked the car in a remote area and continued to sexually assault Doe 1 until she was able to unlock the car door and run away. *Id*. ¶¶ 96-97.

In August 2015, in Charleston, South Carolina, Doe 2 and a group of friends got a ride from Uber driver Patrick Aiello, after Doe 2's friend arranged the ride using Uber's App. *Id*. ¶¶ 12, 111-114. Aiello drove the group to a bar. *Id*. ¶ 119. He commented that he would like to give the group a ride home, and someone in the group asked Aiello if he would agree to pick them up later. *Id*. ¶¶ 122. The group later saw Aiello enter that same bar and observed him sitting at the bar during the night. *Id*. ¶¶ 123, 125.

At the end of the evening, Aiello drove Doe 2 and a friend from the group back to her friend's apartment. *Id*. ¶ 128. During the ride, Doe 2 mentioned that she could not find her phone and wanted to look for it at the apartment. *Id*. ¶ 129. Doe 2 "intended to collect her phone from her friend's apartment and walk the two blocks home to her apartment." *Id*. ¶ 130. After looking for her phone for five to ten minutes, Doe 2 left for her own apartment. *Id*. ¶ 131.

"When Ms. Doe 2 went outside, Aiello said he would drive her home." *Id*. ¶ 132. "[S]till believing that Aiello was acting in his capacity as an Uber driver," Doe 2 got into the car and gave Aiello her home address. *Id*. ¶ 133. Shortly thereafter, Doe 2 realized that Aiello was driving the wrong way. *Id*. ¶ 134. When she pointed this out, Aiello asked, "How are you going to pay me?" and told Doe 2 that she owed him a blow job. *Id*. ¶¶ 135-136. Doe 2 tried to get out of the car, but Aiello had locked the doors. *Id*. ¶ 137. Aiello drove the car to a remote parking lot off a highway area where he "proceeded to viciously rape her and threaten her with harm multiple times." *Id*. ¶¶ 138-139. Afterwards, Doe 2 "was able to get onto the highway, crossed to the median, and then started running alongside the highway away from the parking lot." *Id*. ¶ 140. A car hit Doe 2's arm while she was waving for help. *Id*. ¶ 141. The car then stopped and called 911. *Id*. Police took Doe 2 to the hospital, where she became suicidal and was transferred to a psychiatric unit for three days. *Id*. ¶¶ 141, 143.

The Amended Complaint alleges that Uber's background check system dates back seven years. *Id*. ¶¶ 58-59, 66. After her assault, Doe 1 learned that Dakiri had resided in the United States for less than three years. *Id*. ¶ 100. Aiello had a previous domestic violence arrest, resulting in an assault conviction in April 2003. *Id*. ¶¶ 115, 117. Aiello applied to become a driver for Uber in 2015. *Id*. ¶¶ 117-118.

On October 8, 2015, Doe 1 and Doe 2 filed this lawsuit against Uber. Docket No. 1. The Court has jurisdiction based on diversity jurisdiction under 28 U.S.C. § 1332. *Id*. ¶ 15. Uber moved to dismiss the complaint on December 3, 2015. Docket No. 34. On January 20, 2016, plaintiffs filed their Amended Complaint, thereby mooting Uber's motion. Docket Nos. 46, 48. In their Amended Complaint, plaintiffs bring six claims for relief: (1) negligence and negligent hiring, supervision, and retention; (2) fraud; (3) battery; (4) assault; (5) false imprisonment; and (6) intentional infliction of emotional distress. [1] AC ¶¶ 248-300. Plaintiffs bring claims 3 through 6 against Uber under a theory of respondeat superior. *Id*. ¶¶ 269, 276, 284, 291. Plaintiffs seek

---

[1] Plaintiffs include language under the IIED claim that more properly supports a claim for negligence. *See* AC ¶¶ 296-298. At the hearing, plaintiffs confirmed that they bring this claim under a theory of intentional infliction of emotional distress.

3

1    declaratory and injunctive relief, damages (including punitive damages), and attorneys' fees and
2    costs. *Id*. at 54-55.

3    Uber now moves to dismiss the Amended Complaint for failure to state a claim under
4    Federal Rule of Civil Procedure 12(b)(6). Docket No. 49, Motion to Dismiss ("Mot."). Uber
5    argues that plaintiffs have failed to state a claim for relief as to all six of their claims. Uber asks
6    that the Court dismiss plaintiffs' prayer for punitive damages. Uber also seeks to seal an exhibit
7    filed in support of its motion. Docket No. 52.

8    Following the hearing on April 1, 2016, Uber sought leave to file a supplemental brief.
9    Docket No. 61. The Court granted both parties leave to file supplemental briefs, which they filed
10   on April 8, 2016. Docket Nos. 62, 66, 67.

## LEGAL STANDARD

13   Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint
14   if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to
15   dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its
16   face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard
17   requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant
18   has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require
19   "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to
20   relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

21   In deciding whether a plaintiff has stated a claim upon which relief can be granted, the
22   court must assume that the plaintiff's allegations are true and must draw all reasonable inferences
23   in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).
24   However, the court is not required to "accept as true allegations that are merely conclusory,
25   unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536
26   F.3d 1049, 1055 (9th Cir. 2008).

27   If the court dismisses the complaint, it must then decide whether to grant leave to amend.
28   The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no

4

1  request to amend the pleading was made, unless it determines that the pleading could not possibly
2  be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)
3  (citations and internal quotation marks omitted).

## DISCUSSION

### I. Claims Relying on Respondeat Superior Theory

Uber urges the Court to dismiss plaintiffs' claims 3 through 6, which rely on a theory of respondeat superior. Uber argues that plaintiffs have not alleged sufficient facts to establish that there is an employment relationship between Uber and drivers Dakiri and Aiello. Mot. at 4. Uber alternatively argues that it cannot be vicariously liable because, it claims, sexual assault falls outside the scope of an employee's duties. *Id*. at 9. Uber also disputes plaintiffs' assertion that Uber is a "common carrier." *Id*. at 13.

#### A. Employer-Employee Relationship

Under California law, "an employer may be held vicariously liable for torts committed by an employee within the scope of employment." *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 208 (1991) (citation omitted). The parties dispute whether Uber drivers are employees of Uber; plaintiffs allege that they are and defendants argue that they are not employees but are independent contractors. *See, e.g.*, AC ¶¶ 36-51; Mot. at 6; Docket No. 55, Reply at 4. Whether an individual is classified as an employee or as an independent contractor depends on "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989) (citations omitted); *see also Bradley v. Cal. Dep't of Corrs. and Rehab.*, 158 Cal. App. 4th 1612, 1626 (2008) ("The prevailing view is to consider the totality of the circumstances, reflecting upon the nature of the work relationship between the parties, and placing emphasis on the control exercised by the employer over the employee's performance of employment duties.") (citing *Vernon v. State*, 116 Cal. App. 4th 114, 124-25 (2004)).

While control is the key factor, California courts have recognized other indicia as relevant to defining employment status. Derived from the Restatement (Second) of Agency § 220,[2] these considerations include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*S.G. Borello*, 48 Cal. 3d at 351 (citations omitted). Additionally, "[s]trong evidence in support of an employment relationship is the right to discharge at will, without cause." *Id*. at 350-51 (citations omitted). "The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship." *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 10-11 (2007).

As this multiple-factor approach suggests, a person's status as an employee or independent contractor is a question of fact, but may be determined as a matter of law "if from all the facts only a single inference and one conclusion may be drawn . . . ." *Borello*, 48 Cal. 3d at 367 (citations omitted); *see also Serv. Employees Int'l Union*, 225 Cal. App. 3d 761, 771 (1990) ("[T]he question whether one is an independent contractor, agent or employee is largely one of fact depending on all the circumstances of the relations of the parties.") (quoting *Housewright v. Pacific Far East Line, Inc.*, 229 Cal. App. 2d 259, 265 (1964)).

Here, plaintiffs have alleged sufficient facts to claim plausibly that an employment relationship exists. In support of this assertion, plaintiffs have alleged that Uber sets fare prices without driver input and that drivers may not negotiate fares. AC ¶ 39. If a driver takes a circuitous route, Uber may modify the charges to the customer. *Id*. ¶ 40. Uber retains control

---

[2] Although the Restatement (Second) of Agency has now been superseded by the Restatement (Third) of Agency, the factors continue to be used by the courts and remain largely identical, save replacing the terms "master" and "servant" with "employer" and "employee." *See Schmidt v. Burlington N. & Santa Fe Ry. Co.*, 605 F.3d 686, 690 n.3 (9th Cir. 2010).

1  over customer contact information. *Id*. ¶ 42.  Uber's business model depends upon having a large
2  pool of non-professional drivers. *Id*. ¶ 25.  There are no apparent specialized skills needed to
3  drive for Uber. *Id*. ¶¶ 36-38, 53-66.  Uber retains the right to terminate drivers at will. *Id*. ¶ 43.

4  Uber also controls various aspects of the manner and means by which drivers may offer
5  rides through the Uber App.  Among these, plaintiffs have alleged that Uber requires drivers to
6  accept all ride requests when logged into the App or face potential discipline. *Id*. ¶ 44.  The
7  Amended Complaint also asserts that Uber requires drivers to:

> dress professionally; send the customer who has ordered a ride a text message when the driver is 1-2 minutes away from the pickup location; keep their radios either off or on "soft jazz or NPR;" open the door for the customer; and pick up the customer on the correct side of the street where the customer is standing.

*Id*. ¶ 45.

Certain factors, as alleged, support Uber's assertion that drivers are independent contractors, though not enough to convert the question into a matter of law. *See Borello*, 48 Cal. 3d at 367.  These include that the drivers generally do not receive a salary but are paid by the ride and that the drivers supply their own cars and car insurance.  AC ¶¶ 41, 50-51.  Even these factors, however, are not necessarily dispositive. *See Estrada*, 154 Cal. App. at 1, 5 (finding drivers for FedEx to be employees even where drivers supplied their own trucks and maintained their own car insurance);[3] *see also* AC ¶¶ 47-48 (alleging that in certain cities Uber drivers may receive a guaranteed minimum rate, "tantamount to a salary," and that in January 2016 Uber announced that drivers will have guaranteed earnings, thereby—in plaintiffs' view—giving "Uber drivers everywhere . . . essentially guaranteed salaries . . . .").  It matters not whether Uber's licensing agreements label drivers as independent contractors, if their conduct suggests otherwise. *See Estrada*, 154 Cal. App. at 10-11 (citations omitted); Mot. at 6-7.

---

[3] Uber cites a similar case for the opposite proposition, but, as discussed further *infra*, Uber draws from the dissenting and not the majority opinion. *See* Mot. at 9 (citing *Elijahjuan v. Super. Ct.*, 210 Cal. App. 4th 15, 31-32 (2012)).

7

Other judges in this district have ruled likewise in similar cases. In *O'Connor v. Uber Technologies, Inc.*, Judge Chen found that plaintiff Uber drivers had sufficiently alleged the existence of an employment relationship.[4] The complaint in that case alleged that drivers:

> are required to follow a litany of detailed requirements imposed on them by Uber and they are graded, and are subject to termination, based on their failure to adhere to these requirements (such as rules regarding their conduct with customers, the cleanliness of their vehicles, their timeliness in picking up customers and taking them to their destination, what they are allowed to say to customers, etc.)[.]

*O'Connor v. Uber Techs., Inc.*, No. 13-cv-3826, 2013 WL 6354534, at *6 (N.D. Cal. Dec. 5, 2013). In *Cotter v. Lyft, Inc.*, Judge Chhabria denied a summary judgment motion brought by software app operator Lyft. Judge Chhabria refused to find as a matter of law that drivers who used the Lyft app were independent contractors, where the evidence showed that "Lyft retains a good deal of control over how [the drivers] proceed." *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015). This included rules such as not talking on the phone with passengers present, not requesting tips, and not asking for a passenger's contact information, with Lyft reserving the right to penalize or terminate drivers who did not comply with the rules. *Id*. at 1078-79.

It may be that facts will ultimately be revealed that disprove plaintiffs' allegations or that tilt the scales toward a finding that Uber drivers are independent contractors. However, taking the allegations in the Amended Complaint as true, plaintiffs have alleged sufficient facts that an employment relationship may plausibly exist.

### B. Acts within the Scope of Employment

Uber argues in the alternative that it cannot be vicariously liable for Aiello and Dakiri's acts because "sudden sexual assaults by employees are outside the scope of an employee's duties and cannot support employer liability." Mot. at 9. This is not necessarily so under California law.

---

[4] The Court notes that the plaintiffs have filed a motion for preliminary approval of a class action settlement in that case. *O'Connor*, No. 13-cv-3826, Docket No. 518. The hearing on the motion is set for June 2, 2016. *Id*.

8

"For the doctrine of respondeat superior to apply, the plaintiff must prove that the employee's tortious conduct was committed within the scope of employment." *Mary M.*, 54 Cal. 3d at 209. This analysis asks whether "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* (quoting *Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962, 968 (1986)). This "foreseeability" analysis looks not to "statistical frequency, but [to the] relationship between the nature of the work involved and the type of tort committed." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 302 (1995). As guidance, courts in California consult three policy goals underlying the respondeat superior doctrine: "preventing future injuries, assuring compensation to victims, and spreading the losses caused by an enterprise equitably . . . ." *Id.* at 304. Whether an employee was acting within the scope of employment is a question of fact, unless "the facts are undisputed and no conflicting inferences are possible." *Mary M.*, 54 Cal. 3d at 213 (quoting *Perez*, 41 Cal. 3d at 968).

With respect to sexual misconduct by an employee, the California Supreme Court has not declared, as Uber would have it, that such acts always bar vicarious liability on the part of the employer. *See, e.g., Lisa M.*, 12 Cal. 4th at 297 n.3, 300 (noting that causal nexus to the employee's work is required, that such acts are not per se unforeseeable, and that California has abandoned the "motive-benefit" test that would preclude vicarious liability for most sexual assaults). In *Mary M.*, the California Supreme Court held the city of Los Angeles liable when a police officer, after detaining a woman during a traffic stop, followed the woman to her home and raped her. *Mary M.*, 54 Cal. 3d at 207. Several years later, however, in *Lisa M.*, the court found that an ultrasound technician was not acting within the scope of his employment when he molested a patient during an examination. Distinguishing its prior holding in *Mary M.*, the court explained that the ultrasound technician "had no legal or coercive authority over plaintiff." *Lisa M.*, 12 Cal. 4th at 303. Rather, "[h]is subsequent battery of the patient was independent of the narrow purpose for which plaintiff was asked to trust him." *Id.* at 304. In *Xue Lu v. Powell*, 621 F.3d 944 (9th Cir. 2010), the Ninth Circuit navigated the tension between the decisions in *Mary M.* and *Lisa M.*, explaining that "[t]he liability of a private employer in California does not turn on the

9

1  vulnerability of the victim but on the extent to which the tort of the employee is incident to his
2  employment." *Xue Lu*, 621 F.3d at 949.  After assessing questions of foreseeability and the policy
3  goals underlying respondeat superior, the appeals court found that an asylum officer was acting
4  within the scope of his employment when he molested applicants for asylum. *See id.* at 947-48.

5          In this case, which is only at the pleading stage, foreseeability and policy rationales weigh
6  in favor of allowing the complaint to move forward on the scope of employment question.  It may
7  be that sexual assault by a taxi driver (or a taxi-like driver, as the case may be) "is not so unusual
8  or startling that it would seem unfair to include the loss resulting from it among other costs of the
9  employer's business." *See Lisa M.*, 12 Cal. 4th at 299 (citations omitted).  Assaults of this nature
10 are exactly why customers would expect taxi companies to perform background checks of their
11 drivers.  Holding Uber liable could also forward the underlying policy goals of respondeat
12 superior, including  prevention of future injuries and assurance of compensation to victims.
13 Unlike in cases of sexual harassment, for instance, plaintiffs in this case do not have separate
14 remedies under Title VII or California's Fair Employment and Housing Act.  *See Farmers Ins.*
15 *Group v. County of Santa Clara*, 11 Cal. 4th 992, 1019-1020 (1995) (finding on summary
16 judgment that sexual harassment was outside scope of employment, such that harasser could not
17 seek indemnity from the county as his employer).  Arguably, though perhaps more tenuously, it is
18 possible that allowing liability would more equitably spread the losses caused by the enterprise of
19 shuttling customers in private cars.

20         Uber singles out the allegations against driver Aiello in particular, arguing that plaintiffs
21 have failed to allege that Aiello was using the Uber App at the time that he assaulted Doe 2 and
22 therefore that he can't have been acting within the scope of employment.  Mot. at 11-13.  The
23 Amended Complaint states that Doe 2's friend used the Uber App to arrange the initial pick-up
24 from Aiello to a bar but is silent as to whether the App was used to summon Aiello at the end of
25 the night.  *See* AC ¶¶ 113-114.  The Amended Complaint alleges that someone in the group asked
26 Aiello at the end of the initial car ride whether he would agree to pick them up later.  *Id.* ¶ 122.
27 Plaintiffs also allege that Doe 2 got back into Aiello's car at the end of the night, after he dropped
28 off her friend, "still believing that Aiello was acting in his capacity as an Uber driver . . . ." *Id.* ¶¶

128-133.

It is no longer a principle under California law that an employer may be vicariously liable for an employee's assault only when the assault was committed to further the interests of the employer. *Lisa M.*, 12 Cal. 4th at 297 n. 3 ("[T]he 'motive-benefit' test, which would preclude respondeat superior liability for most sexual assaults, has been 'abandoned' in California.") (citing LeGrand & Leonard, *Civil Suits for Sexual Assault: Compensating Rape Victims*, 8 Golden Gate L. Rev. 479, 507 (1979)). The same principles regarding prevention of future injuries, assurance of compensation to victims, and equitably spreading the losses caused by Uber's business model apply with regard to Aiello. A finder of fact could determine that Aiello was acting within the scope of his employment where he was summoned using the Uber App, even if rides were offered and received later that night without the use of the App. Taking the allegations in the light most favorable to plaintiffs, as is required at this stage of the case, it is plausible that the rides Doe 2 took at the end of the night came about only because of Aiello's affiliation with Uber.

In sum, the Court cannot determine -- as Uber effectively argues -- that as a matter of law sexual assault by Uber drivers is always outside the scope of employment, if the drivers are in fact ultimately found to be employees. The California Supreme Court has left this question open. *See Mary M.*, 54 Cal. 3d at 218 n.11. Like a police officer who rapes a detained woman, an employee who throws a hammer at a fellow worker in a fit of irritation, or an asylum officer who abuses his role to corner female immigrants and molest them, sexual assault by an Uber driver may be incidental to the operation of its business. *See Xue Lu*, 621 F.3d at 948-49 (citing, inter alia, *Carr v. Wm. C. Crowell Co.*, 28 Cal. 2d 652 (1946)). At the very least, the pleadings present a close enough call that the Court finds no reason to deviate from the ordinary rule that "the determination whether an employee has acted within the scope of employment presents a question of fact . . . ." *See Mary M.*, 54 Cal. 3d at 213. For the purpose of surviving a motion to dismiss, plaintiffs have plausibly alleged that drivers Dakiri and Aiello were acting within the scope of employment when they assaulted plaintiffs.

**C.     Common Carrier**

Plaintiffs seek to hold Uber liable as a common carrier with respect to claims 3 through 6. AC ¶¶ 269, 276, 284, 291. They state that "[a]s a common carrier, Defendant is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment." *Id.*

For the purposes of tort claims, California law defines "common carrier" as follows: "Every one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code § 2168; *see also Squaw Valley Ski Corp. v. Super. Ct.*, 2 Cal. App. 4th 1499, 1507 (1992). "Hence, a common carrier within the meaning of Civil Code section 2168 is any entity which holds itself out to the public generally and indifferently to transport goods or persons from place to place for profit." *Id.* at 1508.

In their briefs and at the hearing, Uber has argued that it is not a common carrier but that it is a "broker" of transportation services. The Court is not persuaded by this argument. Uber cites to two cases in support of this proposition. One involved a defendant which was found, on summary judgment, not to be a common carrier but to be a property broker. Reply at 7-8 (citing *Chubb Group v. H.A. Transp. Sys., Inc.*, 243 F. Supp. 2d 1064, 1070 (C.D. Cal. 2002)). There, the broker had contracted with a transportation company, which had then subcontracted with a trucking company, for the transportation of cigarettes; the cigarettes were eventually stolen from a truck while the truck was parked at a restaurant. *Chubb Group*, 243 F. Supp. 2d at 1066-67. Factually, this little resembles the situation at hand. Uber also argues that it is a transportation broker by presenting the dissent of a California Court of Appeal decision as the majority holding. *See* Mot. at 9 (citing *Elijahjuan v. Superior Court*, 210 Cal. App. 4th 15, 31-32 (2012)). The majority opinion stated, "The sole substantive issue on appeal is whether the parties agreed to arbitrate their dispute." Uber's reliance on this case is therefore misplaced. *See also O'Connor*, 82 F. Supp. 3d at 1137-38, 1141-45 (granting summary judgment against Uber over Uber's arguments that it was "a 'technology company,' not a 'transportation company'").

Uber also argues that a common carrier finding "would merely . . . impose a heightened duty of care; it would not displace the rule that an employer cannot be liable for employee misconduct outside the scope of employment." Mot. at 13. Many of the cases that Uber cites rely on a negligence theory. In *Lopez*, for instance, the California Supreme Court held that the common carrier bus company owed a higher degree of care to its passengers and was not immune from liability when passengers injured other passengers on the bus. *See Lopez v. S. California Rapid Transit Dist.*, 40 Cal. 3d 780, 783 (1985). In *San Francisco v. Superior Court*, the Court of Appeal noted that a common carrier "must use the utmost care and diligence for [the] safe carriage [of its passengers]." *City & Cty. of San Francisco v. Super. Ct.*, 31 Cal. App. 4th 45, 47-49 (1994). The reason the bus company was not held liable for a passenger's attack in that case was because no amount of care or diligence by the bus driver could have prevented the sudden stabbing of a passenger, when the assailant gave "no warning or cause for alarm" until he pulled out a knife seconds beforehand. *Id*.

A different analysis is required when the assailant is the common carrier's own employee. *In Berger v. Southern Pacific Co.*, 144 Cal. App. 2d 1 (1956), the California Court of Appeal found that the jury was properly instructed that the Pullman Company could be liable for the rape that its porter committed upon a passenger. *Berger*, 144 Cal. App. 2d at 9. Quoting from a treatise, the court explained, "The liability of a common carrier for an assault by one of its employees on a passenger is not dependent on the question as to whether the employee was acting within the scope of his authority or in the line of his duty, but is based upon its broad duty as a common carrier to protect its passengers from assault." *Id*. at 7.

When given an opportunity to brief the matter further, Uber argued the *Berger* decision "is at odds with Supreme Court authority, ignores comparable cases decided before it, and violates modern tort principles." Docket No. 66, Def.'s Suppl. Br. at 1. However, Uber relied largely on cases addressing negligence or passenger-on-passenger assault, and on a case decided by the New York Court of Appeals. These cases simply are not analogous to the present facts, where plaintiffs have alleged that an employee intentionally sexually assaulted a passenger.

13

1    Plaintiffs have alleged sufficient facts to plausibly claim that Uber is a common carrier.
2 Looking beyond any conclusory assertions, plaintiffs have alleged critical underlying facts: that
3 Uber's services are available to the general public and that Uber charges customers standardized
4 fees for car rides. AC ¶ 24. Though plaintiffs allege that *drivers* may have their driving privileges
5 revoked, plaintiffs do not allege, nor does defendant counter, that an Uber *customer* may lose
6 riding privileges. *See* AC ¶ 43. Plaintiffs' allegations support the claim that Uber "offers to the
7 public to carry persons," thereby bringing it within California's definition of common carrier for
8 tort purposes. *See* Cal. Civ. Code § 2168; *see also Squaw Valley*, 2 Cal. App. 4th at 1508 (finding
9 defendant to be a common carrier because it "indiscriminately offers its . . . chair lift to the public
10 to carry skiers at a fixed rate").

11   Plaintiffs may, or may not, ultimately prevail on their vicarious liability claims. As Judge
12 Chhabria noted when analyzing the claims of Lyft drivers, "The test the California courts have
13 developed over the 20th Century for classifying workers isn't very helpful in addressing this 21st
14 Century problem." *Cotter*, 60 F. Supp. 3d at 1081. To the extent that these are close questions,
15 the Court finds that they are more appropriately resolved at a later stage of the litigation. For now,
16 plaintiffs have sufficiently alleged the claims, and accordingly, the Court DENIES Uber's motion
17 to dismiss claims 3 through 6.

### II. Claim for Negligent Hiring, Supervision, and Retention

20   In addition to suing Uber vicariously for the torts of Dakiri and Aiello, plaintiffs also seek
21 to hold Uber directly liable for negligent hiring, supervision, and retention. *See* AC at 46. Setting
22 aside the arguments regarding employment status that the Court has already addressed, Uber's key
23 argument is that no claim for relief may lie where plaintiffs have not plausibly alleged that Uber
24 knew or should have known that Dakiri and Aiello posed any danger. Mot. at 14.

25   Under California law, an employer may be held directly liable for the behavior of an unfit
26 employee where the employer was negligent in the hiring, training, supervising, or retaining of
27 that employee. *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006). Negligence
28 liability will be imposed upon the employer if it knew or should have known that hiring the

employee created a particular risk or hazard and that particular harm then materializes. As such, California follows the rule set forth in the Restatement (Second) of Agency Section 213, which provides in pertinent part: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in the employment of improper persons or instrumentalities in work involving risk of harm to others." Liability may be imposed "either on the basis of . . . action -- for example, the negligent hiring of an agent -- or . . . inaction -- for example, the failure to provide adequate supervision of the agent's work." *Far West Financial Corp. v. D & S Co.*, 46 Cal. 3d 796, 812 (1988).

As to driver Aiello, plaintiffs allege as follows. When Aiello signed up as an Uber driver, Uber used a background check company called Accurate Background, Inc. AC ¶ 58. Accurate would run a potential driver's social security number "through records databases similar to those held by credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions." *Id*. ¶ 59. Aiello had previously been arrested for domestic violence and was ultimately convicted of assault in 2003. *Id*. ¶¶ 115, 117. The background check did not capture this conviction. *Id*. ¶ 118. Plaintiffs allege that Uber knew or should have known that Aiello "would be a danger to passengers and lead to a risk of the very type of danger and harm that occurred on . . . August 9, 2015." *Id*. ¶ 250.

Uber does not directly dispute these allegations but characterizes Aiello's prior conviction as a "12-year-old disorderly-persons offense that could have been expunged." Mot. at 15. Uber supports its claim with an exhibit, asking the Court to incorporate the exhibit by reference or to take judicial notice of it.[5] *See* Docket Nos. 50, 51 ¶ 7, Ex. 5. Plaintiffs oppose this request. Docket No. 54, Opposition at 17 n.9. It is not apparent at this time that the document Uber presents is the same offense to which the Amended Complaint refers. The Court therefore

---

[5] Uber has separately filed a motion to seal this exhibit, the state court record of Aiello's 2003 conviction. Docket No. 52. Uber concedes that this document is a matter of public record. Reply at 11 n.3. At the hearing, Uber stated that it did not think the Court required the document in order to dispose of the motion and indicated that it would withdraw the document. Given that Uber has filed no notice of withdrawal to date, and finding the document inappropriate for sealing, the Court hereby DENIES the motion to seal.

15

1   DENIES Uber's request for incorporation by reference and judicial notice.[6] Taking the facts in the Amended Complaint as true, the Court finds that plaintiffs have sufficiently alleged that Uber should have known about Aiello's criminal history such that Uber may be liable for negligent hiring, supervision and retention. The motion to dismiss plaintiffs' first claim for relief is therefore DENIED as to Aiello.

Plaintiffs fail, however, to make such allegations as to driver Dakiri. The Amended Complaint alleges that Dakiri had been in the country for less than three years when he assaulted Doe 1 and that Uber used Accurate Background, Inc. to run a background check. AC ¶¶ 58-59, 100. The relevant allegations end there. Plaintiffs do not allege that anything existed in Dakiri's background that Uber knew or should have known and that should have prevented Uber's approval of Dakiri as a driver. The motion to dismiss plaintiffs' claim of negligent hiring, supervision, and retention is therefore GRANTED as to Dakiri. The Court grants the motion without prejudice to a later request to amend this claim to add Dakiri back in should further information come to light.

### III.   Claim for Fraud

For allegations of fraud or mistake, a complaint must meet the heightened pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A claim for fraud must have the following elements: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or 'scienter'); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Anderson v. Deloitte & Touche LLP*, 56 Cal. App. 4th 1468, 1474 (1997) (citation omitted); *see also In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) ("[A] plaintiff must set forth what is false or misleading about a statement, and why it is false."). "Averments of fraud must be accompanied by the 'who, what, where, and how' of the

---

[6] Plaintiffs do not challenge Uber's request with respect to Exhibits 1 through 4. Finding no opposition and no reason to doubt that the documents are what they purport to be, the Court GRANTS Uber's request for judicial notice of Exhibits 1 through 4 of the Cohen declaration. *See* Docket No. 51.

misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997)). Rule 9(b) is satisfied if the allegations "identif[y] the circumstances constituting fraud (or mistake) so that the defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). "Rule 9(b)'s particularity requirement applies to state-law causes of action." *Vess*, 317 F. 3d at 1103.

Plaintiffs base their second claim for relief on fraud. They assert that Uber made false statements that riders would be safe taking rides through Uber, while knowing that Uber "had not adequately screened its drivers." AC ¶¶ 259-260. They also assert that Uber fraudulently misrepresented its ability to track its drivers "and ensure that the drivers were taking the most direct routes to Plaintiffs' destinations, instead of going far off-route." *Id.* ¶ 261. Uber argues that plaintiffs have failed to plead their fraud claim with particularity, in that: (1) they fail to identify what is false about Uber's statements regarding driver background checks; (2) they fail to identify what is false about Uber's ability to track drivers' routes, and about when, where, or how Uber made such statements; and (3) they fail to establish reliance. Mot. at 16-17.

The Amended Complaint is replete with allegations regarding the falsity of Uber's claims. Plaintiffs describe in detail the process by which individuals become drivers for Uber and how Uber screens those applicants. AC ¶¶ 36-38, 53-66. They include extensive quotes that plaintiffs challenge as false, including ones that plaintiffs pulled from Uber's website and from a report commissioned by Uber and Mothers Against Drunk Driving. *Id.* ¶¶ 2-3, 70-71, 74-76, 236. Uber clearly appears to understand what statements plaintiffs are challenging, as Uber summarizes and refutes those allegations in its motion. *See* Mot. at 16-17. There is more than enough information for Uber to "prepare an adequate answer from the allegations." *Moore*, 885 F.2d at 540. Moreover, plaintiffs cite to statements that Uber should readily have in its possession and be able to identify. *See Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1191 (C.D. Cal. 2011) ("While the already heightened pleading standard is further heightened when a party pleads fraud against a corporation, . . . the requirement is relaxed where 'the defendant must necessarily

17

1    possess full information concerning the facts of the controversy,' . . . or 'when the facts lie more in
2    the knowledge of the opposite party[.]'") (citations omitted).

3          The Amended Complaint also alleges that plaintiffs "actually and reasonably relied on the
4    false facts and misrepresentations provided by Defendant when they agreed to utilize Uber's
5    services." AC ¶ 264. At this stage of the case, the Court must draw all reasonable inferences in
6    favor of the non-moving party. *See Usher*, 828 F.2d at 561. It is reasonable for the Court to infer
7    from the allegations in the complaint that Doe 1 and Doe 2 assert that they accepted rides from
8    Uber drivers in reliance on the statements Uber made regarding rider safety. Uber further argues
9    that Doe 2 in particular could not have relied on Uber's statements if she was not using the App
10   when she rode with Aiello. Mot. at 17; Reply at 13. If Uber is correct that Doe 2 rode with Aiello
11   without using the Uber App, it is reasonable for the Court to infer that she did so because she
12   relied on Uber's stamp of approval that Aiello was a safe person from whom to obtain a ride.

13         Accordingly, Uber's motion to dismiss plaintiffs' fraud claim is DENIED.

## IV. Punitive Damages

16         Lastly, Uber seeks dismissal of the request for punitive damages. Under California law, a
17   plaintiff may recover punitive damages in connection with a non-contractual claim if she
18   establishes by clear and convincing evidence that the defendant is guilty of (1) fraud, (2)
19   oppression or (3) malice. Cal. Civil Code § 3294(a). For an employer to be liable for those
20   damages, it must have "had advance knowledge of the unfitness of the employee and employed
21   him or her with a conscious disregard of the rights or safety of others or authorized or ratified the
22   wrongful conduct . . . *or [been] personally guilty of oppression, fraud, or malice*." *Id*. § 3294(b)
23   (emphasis added).

24         Uber's argument focuses on the first portion of Section 3294(b), whether Uber had
25   advance knowledge of Dakiri or Aiello's unfitness. Mot. at 18-19. Uber ignores that punitive
26   damages may also be appropriate under that same subsection if Uber itself is found guilty of fraud.
27   *See* Cal. Civil Code § 3294(b). At the pleadings stage, a plaintiff need not plead all of the
28   elements of a claim for punitive damages but need only plead such facts as could plausibly support

18

the underlying claim of fraud that will support a punitive damages award. *See Susilo*, 796 F. Supp. 2d at 1196-97.[7] Because plaintiffs have successfully pleaded a fraud claim, § III, *supra*, the Court DENIES Uber's motion to dismiss the claim for punitive damages.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby: GRANTS Uber's motion to dismiss the negligent hiring, supervision, and retention claim (claim 1) as it relates to Dakiri, without prejudice, but DENIES the motion as it relates to Aiello; DENIES the motion to dismiss plaintiffs' fraud claim (claim 2); DENIES Uber's motion to dismiss claims brought under a respondeat superior theory (claims 3 through 6); and DENIES Uber's motion to dismiss requests for punitive damages. The Court also DENIES Uber's motion to seal Exhibit 5 to the Cohen declaration. *See* Docket No. 52.

**IT IS SO ORDERED**.

Dated: May 4, 2016

SUSAN ILLSTON
United States District Judge

---

[7] *Susilo* was later called into question by another district court in *Crisanto v. Cty. of Tulare*, No. 15-cv-1527, 2015 WL 7188165 (C.D. Cal. Nov. 16, 2015). *Crisanto* questioned whether the court in *Susilo* correctly applied the legal standard to strike a claim for punitive damages under Rule 12(f). *Crisanto*, 2015 WL 7188165, at *6 n.5. Because Uber seeks the dismissal of plaintiffs' punitive damages claim here under Rule 12(b)(6), the Court finds that the *Susilo* analysis applies.